# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP2680-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |    Plaintiff-Appellant-Petitioner, |
| |   v. |
| | Patrick J. Lynch, |
| |    Defendant-Respondent. |

REVIEW OF A DECISION BY THE COURT OF APPEALS
(Reported at 359 Wis. 2d 482, 859 N.W.2d 125)
(Ct. App. 2014 – Published)
PDC No: 2015 WI App 2

| | |
|---|---|
| OPINION FILED: | July 13, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 12, 2015 |

| SOURCE OF APPEAL: | |
|---|---|
|  COURT: | Circuit |
|  COUNTY: | Dodge |
|  JUDGE: | Andrew P. Bissonette |

| JUSTICES: | |
|---|---|
|  CONCURRED: | ROGGENSACK, C. J. concurs (Opinion filed). |
|  CONCURRED/DISSENTED: | ABRAHAMSON, J. and BRADLEY, A. W., J. concur and dissent (Co-authored opinion filed). |
|  DISSENTED: | PROSSER, J. dissents (Opinion filed). |
| | ZIEGLER, J. dissents (Opinion filed). |
|  NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-appellant-petitioner, the cause was argued by *Marguerite M. Moeller*, assistant attorney general, with whom on the briefs was *Brad D. Schimel,* attorney general.

For the defendant-respondent, there was a brief by *Robert R. Henak,* and the *Henak Law Office, S.C.*, Milwaukee, WI, with whom on the brief was *Christopher T. Van Wagner* and *Christopher T. Van Wagner S.C.*, Madison, WI. Oral argument by *Robert R. Henak.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2011AP2680-CR
(L.C. No. 2010CF365)

STATE OF WISCONSIN            :        IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Appellant-Petitioner,**

    **v.**

**Patrick J. Lynch,**

    **Defendant-Respondent.**

**FILED**

**JUL 13, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *As a result of a divided court, the law remains as the court of appeals has articulated it.*[1]

---

[1] While five Justices would reverse the decision of the court of appeals——in whole or in part——no more than three Justices can agree on the same rationale or result. Consequently, the law remains as the court of appeals has articulated it. First, Justice Gableman, joined by Chief Justice Roggensack and Justice R.G. Bradley, would overturn State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993) modified by State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298 (hereinafter Shiffra/Green). Second, Justice Abrahamson and Justice A.W. Bradley would not overturn Shiffra/Green but would interpret Shiffra to allow for additional remedies, including release of the privileged records pursuant to Wis. Stat. § 146.82(2)(a)4. Third, Justice Prosser would not overturn Shiffra/Green, and though he would consider additional remedies, he would not permit a circuit court to compel release of the complainant's privileged records pursuant
(continued)

¶1 MICHAEL J. GABLEMAN, J. This is a review of a published decision of the court of appeals[2] that affirmed the Dodge County Circuit Court's[3] findings that (1) Patrick Lynch ("Lynch"), the defendant, made an adequate showing for an in camera review of the complainant's privileged mental health treatment records and (2) the complainant's testimony must be excluded at trial because the complainant refused to disclose her privileged mental health treatment records.

¶2 This case requires us to reexamine State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993) modified by State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298 (hereinafter Shiffra/Green). Shiffra/Green established a process

_____

to Wis. Stat. § 146.82(2)(a)4. Finally, Justice Ziegler would not overturn Shiffra/Green and interprets Shiffra to allow for a single remedy (preclusion of the privilege-holder's testimony). In this case, "no [majority of] justices reach agreement to either affirm, reverse, or modify the decision of the court of appeals consistent with precedent. Consequently, the court of appeals decision remains the law of the case." State v. Johnson, 2014 WI 16, ¶2, 353 Wis. 2d 119, 846 N.W.2d 1 (per curiam) (Johnson II) (citing Phillips v. U.S. Bank Nat'l Ass'n, 2010 WI 131, ¶¶1-2, 329 Wis. 2d 639, 791 N.W.2d 190)).

We note in passing that Justice Abrahamson and Justice A.W. Bradley attempt to divert attention from the merits of this important case. Lest we be incorrectly perceived as accepting their invitation to lose sight of the forest for the trees, here is the bottom line: "the court of appeals decision remains the law of the case." Johnson II, 353 Wis. 2d 119, ¶2 (per curiam).

[2] State v. Lynch, 2015 WI App 2, 359 Wis. 2d 482, 859 N.W.2d 125.

[3] The Honorable Andrew P. Bissonnette presided.

2

under which a criminal defendant in Wisconsin could obtain an in camera review of a person's privileged[4] mental health treatment records.  Under Shiffa/Green, a defendant can acquire a complainant's privileged mental health treatment records when he[5] demonstrates "a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence . . . ."[6] Green, 253 Wis. 2d 356, ¶19.

¶3   In this case, Lynch filed a pretrial motion pursuant to Shiffra/Green, seeking an in camera inspection of "all psychiatric, psychological, counseling, therapy and clinical records" of the complainant for the treatment she received during the time period 1993-2011. The circuit court granted Lynch's motion for in camera review of the complainant's privileged mental health treatment records and ordered the

---

[4] Wisconsin's privilege statute provides, "A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of the patient's physical, mental, or emotional condition . . . ." Wis. Stat. § 905.04(2).

[5] Throughout this opinion, we use the pronoun "he" when referring to a defendant because the defendant, Lynch, is a male.

[6] State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298, states the Shiffra/Green test as follows: "[T]he standard to obtain an in camera review requires a defendant to set forth, in good faith, a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative to other evidence available to the defendant." Id., ¶19.

complainant to sign a release of records. Further, the court informed the complainant that if she refused to turn over her privileged mental health treatment records, her testimony would be "barred at trial." The complainant refused to give up her privileged mental health treatment records "[u]nless and until" the circuit court's determination was reviewed by another court. As a result, the circuit court barred the complainant from testifying at trial. The State appealed, and the court of appeals affirmed the circuit court's order barring the complainant from testifying at trial. The State appealed.

¶4 The State makes three arguments on appeal. First, the State argues that we should overrule Shiffra/Green because it originates from a serious misinterpretation of Pennsylvania v. Ritchie, 480 U.S. 39 (1987). Second, the State argues that, if Shiffra/Green remains, we should clarify that witness preclusion (barring a complainant from testifying at trial) is not the only remedy available to the circuit court when a complainant refuses to waive her privilege. Third, the State argues that a circuit court should be able to use Wis. Stat. § 146.82(2)(a)4. (2013-14)[7] to require production of the privileged mental heath

---

[7] Wisconsin Stat. § 146.82(2)(a)4. (2013-14) allows a patient's confidential health care records to be "released upon request without informed consent" "under a lawful order of a court of record."

All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated. Although the acts giving rise to the alleged crimes in this case date back many years, we cite to the most current version of the statutes as no pertinent changes have been made.

4

treatment records even when the complainant refuses to consent to release.

¶5 Accordingly, three issues are presented for our review.[8] The first is whether we should overrule Shiffra/Green. The second is whether witness preclusion is the only remedy available to the circuit court when a complainant refuses to waive her privilege. The third is whether a circuit court may use Wis. Stat. § 146.82(2)(a)4. to require production of the privileged mental heath treatment records when the complainant refuses to consent to release.

¶6 These issues, in particular the first and second issues, have divided this court for a number of years. See State v. Johnson, 2013 WI 59, 348 Wis. 2d 450, 832 N.W.2d 609 (per curiam) (Johnson I), reconsideration granted, 2014 WI 16, 353

---

[8] The State's petition for review framed the three issues as follows:

1. Do defendants have a constitutional right to disclosure of privately held privileged records? If they do, what is the basis for the constitutional right?

2. After determining that Lynch had made the showing required by Shiffra/Green, could the circuit court have invoked Wis. Stat. § 146.82(2)(a)4. to obtain [the complainant's] records without her consent?

3. Assuming a circuit court cannot obtain a witness's privileged records without her consent pursuant to Wis. Stat. § 146.82(2)(a)4., is witness preclusion always required when a defendant satisfies Shiffra/Green but the victim withholds consent to an in camera review of her privileged records?

Wis. 2d 119, 846 N.W.2d 1 (per curiam) (Johnson II). These issues continue to divide this court.

¶7 Justice Gableman, joined by Chief Justice Roggensack and Justice R.G. Bradley, would overturn Shiffra/Green. Our reasoning is outlined in this lead opinion.[9] Justice Abrahamson and Justice A.W. Bradley would not overturn Shiffra/Green but would interpret Shiffra to allow for additional remedies, including release of the privileged records pursuant to Wis. Stat. § 146.82(2)(a)4. Justice Prosser would not overturn Shiffra/Green, and though he would consider additional remedies, he would not permit a circuit court to compel release of the complainant's privileged records pursuant to § 146.82(2)(a)4. Finally, Justice Ziegler would not overturn Shiffra/Green and interprets Shiffra to allow for a single remedy (preclusion of the privilege-holder's testimony).

¶8 We conclude that Shiffra/Green improperly relied on Ritchie when it invented a right to access privileged information (specifically a complainant's privileged mental health treatment records) via a motion for in camera review. We

---

[9] As noted previously, while five Justices would reverse the decision of the court of appeals——in whole or in part——no more than three Justices can agree on the same rationale or result. As a result, the law remains as the court of appeals has articulated it. See Johnson II, 353 Wis. 2d 119, ¶2 (per curiam) ("Specifically, no [majority of] justices reach agreement to either affirm, reverse, or modify the decision of the court of appeals consistent with precedent. Consequently, the court of appeals decision remains the law of the case." (citing Phillips, 329 Wis. 2d 639, ¶¶1-2)).

further conclude that <u>Shiffra/Green</u> cannot be grounded in any other legal basis, specifically any other constitutional provision. We would, therefore, overrule <u>Shiffra/Green</u> and its progeny. Consequently, we need not address the second and third issues presented for review.[10]

## I. BACKGROUND

¶9 As a young child, the complainant was repeatedly sexually assaulted by her father. It was during this period of sexual abuse that the complainant sought mental health treatment. Her father was eventually charged and convicted of five counts of first-degree sexual assault of a child.

¶10 In the case before us, the complainant alleges that during the same time her father was sexually assaulting her, she was also being sexually assaulted by another——the defendant, Lynch. At the time of the alleged sexual assaults, Lynch was a law enforcement officer and was "good friends" with the complainant's father. According to the complainant, Lynch sexually assaulted her on six or seven occasions in her father's home. The following excerpts taken from the complainant's testimony while she was being questioned by Lynch's attorney at his preliminary hearing reveal the nature of three of the alleged sexual assaults:

---

[10] <u>See, e.g.</u>, <u>Hull v. State Farm Mut. Auto Ins. Co.</u>, 222 Wis. 2d 627, 640 n.7, 586 N.W.2d 863 (1998) ("As a general rule, when our resolution of one issue disposes of a case, we will not address additional issues.").

Q. The first time it happened -- let's talk about the first time it happened. You went into this bathroom that you agree was about three feet by five feet approximately.

A. Yes.

Q. And there is a toilet and sink in this small room.

A. Right.

Q. And what you recall is, what, you walked in the bathroom. Did you close the bathroom door?

A. Yes, I was in there going to the bathroom.

Q. Was your dad in the house at the time?

A. Yes, he was.

Q. And [Lynch] opened the door?

A. And came in.

Q. And were your slacks down at that point because you were going to the bathroom?

A. I was pulling them up because I had just finished going to the bathroom.

Q. And did he then take his clothes off?

A. He then put me on the ground.

. . . .

Q. And did he take your clothes off?

A. I had to pull my pants down.

Q. Did he tell you to do that or did he do it?

A. He told me to do it.

. . . .

Q. Did he take his trousers completely off to the best of your recollection?

8

A. I remember him taking them down. I don't know if they came off completely

Q. You stated that he placed his penis inside of your vagina, correct?

A. Correct.

Q. Did he ejaculate?

A. I don't know.

Q. I know this may be difficult, but approximately how long, in terms of time, was his penis inside of your vagina?

A. Like five or ten minutes.

Q. Did you cry out or scream for help, or did you cry out or scream in pain?

A. No, because I was terrified. He was wearing a cop uniform and he had a gun and I was terrified of what he would do.

Q. To your knowledge did you father know what was going on?

A. Yes.

Q. How do you know that your father knew what was going on?

A. Because he was right outside the door when it was happening.

. . . .

Q. What do you remember happening on the second incident in the winter of 1990?

A. I got called into the bathroom and he told me to take my pants off. That's when he started fondling me.

Q. And did he, during that incident, take off his trousers?

A. Yes.

9

. . . .

Q. [A]fter he started fondling you, did he place you again on the floor?

A. Yes.

Q. And how long did this incident happen going forward?

A. It felt like hours, but it was probably 15, 20 minutes.

Q. Do you remember if he ejaculated during that time?

A. I would believe so. At that time I -- you know, you don't think about anything else. I [was] trying to just block my mind and lay there.

Q. That floor, was it a hard floor or was there a rug on it?

A. Hard.

Q. So like linoleum or something?

A. Cold.

. . . .

Q. So what happened during th[e] [third] occasion?

. . . .

A. I got called down again and I --

Q. Why did you go?

A. Because I felt like I had no choice. I was scared. I was a little girl.

. . . .

Q. Your dad called you down and then [Lynch] took over and --

A. And we went into the bathroom. At that time he made me sit on the toilet and perform oral sex on him.

Q. Did he do -- did anything else occur? Did anything else occur during this time besides oral sex?

A. After that he laid me down on the floor and stuck his penis into my vagina.

Q. Were you crying during this incident?

A. Yes.

Q. The first incident were you crying?

A. Yeah.

Q. Second incident were you crying?

A. I had tears.

Q. Third incident when [another person] was there you were crying?

A. Yes, I had tears. I was afraid to make any noise or any sound.

. . . .

The testimony of the complainant reveals that the alleged sexual assaults included forced "fondling," "oral sex," and "intercourse." According to the complainant, all of the sexual assaults took place in a small bathroom (described in the above testimony) next to the kitchen.

¶11 The complainant also testified that after her father's trial (which took place a few years after the alleged sexual abuse occurred), Lynch would show up where she worked. The following excerpt, again taken from the complainant's testimony at the defendant's preliminary hearing reveals the nature of the alleged stalking:

Q. Tell us what you saw when you were working there during that time? What happened?

A. The first time I saw him through the drive-thru and he did the same thing that he did at [another workplace], and he would stare me down and I walked away at that time. I was a supervisor, so I could exit and I didn't have to take transactions. So I would go in back by the vault.

Q. Okay. How many times did that occur during the time that you were working there between May of 2007 and February of 2008 that he would go through -- that you could see the defendant at the drive-thru?

A. At the drive-thru probably three times, four times.

Q. Okay. Total four times?

A. In the drive-thru. He did come into the lobby of the bank too.

Q. Okay. Tell us about when he would come into the lobby of the bank what would happen.

A. He would walk in and walk up to the table and kind of look at where I was at, and then wait for my teller line to be open, then approach mine. Then I would have one of the tellers come and take my spot and I would exit.

Q. How many times do you recall that happening during the time that you were working there?

A. Like three.

Q. Okay. How do you know . . . that it just wasn't the line that was open for him to conduct business at your teller window?

A. Because there was always more than one teller. I was just the one who filled in when the lines were long. And there would be other tellers open at that time when he would approach my window.

Q. Okay. When this was occurring, how did you feel when you saw the defendant at [your workplace]?

A. I was terrified.

Q. Why is that?

12

A. Because it put me back to when I was a little girl. I mean, I was afraid. He wore the same uniform that he did -- I mean, when he molested me, that he did when he came to [my workplace].

¶12 Many years after the alleged sexual assaults and stalking by Lynch took place, the State charged Lynch with three counts of first-degree sexual assault of a child[11] and three counts of stalking[12].[13]

---

[11] Wisconsin Stat. § 948.02(1) provides, "Whoever has sexual contact or sexual intercourse with a person who has not attained the age of 13 years and causes great bodily harm to the person is guilty of a Class A felony." Sexual intercourse is defined as "vulvar penetration as well as cunnilingus, fellatio, or anal intercourse between persons or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening either by the defendant or upon the defendant's instruction. The emission of semen is not required." Wis. Stat. § 948.01(6).

[12] Wisconsin Stat. § 940.32(2) states,

Whoever meets all of the following criteria is guilty of a Class I felony:

(a) The actor intentionally engages in a course of conduct directed at a specific person that would cause a reasonable person under the same circumstances to suffer serious emotional distress or to fear bodily injury to or the death of himself or herself or a member of his or her family or household.

(b) The actor knows or should know that at least one of the acts that constitutes the course of conduct will cause the specific person to suffer serious emotional distress or place the specific person in reasonable fear of bodily injury to or the death of himself or herself or a member of his or her family or household.

(c) The actor's acts cause the specific person to suffer serious emotional distress or induce fear in the specific person of bodily injury to or the death

(continued)

13

¶13 Prior to trial, Lynch filed a Shiffra/Green motion, seeking to subpoena the complainant's "psychiatric, psychological, counseling, therapy and clinical records" from 1993-2011 for in camera review. Lynch claims that the complainant's treatment records will likely contain information related to his defense. More specifically, Lynch contends the records will show that (1) the complainant exhibits ongoing symptoms of post traumatic stress disorder, which he argues affects her memory; (2) the complainant did not report Lynch to any treatment providers as a child; and (3) the complainant has sociopathic personality disorder, a symptom of which is frequent lying.

¶14 The circuit court granted Lynch's motion for in camera review of the complainant's privileged mental health treatment records. It ordered the complainant to disclose "the names and addresses of all of her treatment providers since January 1, 1980." It then stated, "By treatment providers, the [c]ourt is talking about physicians, psychologists, psychiatrists, and other forms of therapists engaged in any form of counseling with [the complainant] up to the present time." (Emphasis added.) The court further ordered that if the complainant failed to release

of himself or herself or a member of his or her family or household.

[13] Only one of the three stalking charges arose out of Lynch's interactions with the complainant. The other two charges stem from Lynch's interactions with other women.

14

these records to the court, it would, pursuant to the remedy contained in Shiffra/Green, bar her testimony at trial.

¶15 The complainant refused to surrender her privileged mental health treatment records "[u]nless and until" the circuit court's determination was reviewed by another court. As a consequence, the court barred her from testifying against Lynch at trial. The State filed an appeal.

¶16 The court of appeals affirmed. State v. Lynch, 2015 WI App 2, 359 Wis. 2d 482, 859 N.W.2d 125. The court of appeals agreed with the circuit court's finding that Lynch had met the showing required by Shiffra/Green.[14] The court further agreed "with the circuit court that, under Shiffra[/Green], the only available remedy when a victim refuses to disclose records for an in camera review is the exclusion of the victim's testimony at trial." Id., ¶1. As a result, the court of appeals remanded for further proceedings. The State filed a petition for review to this court, and we granted the State's petition.[15]

---

[14] The issue of whether Lynch made the requisite showing under Shiffra/Green is not at issue before this court because the State did not seek review of the court of appeals' conclusion that Lynch met the Shiffra/Green showing.

[15] The dissent repeatedly chastises the State for bringing the present claim before this court. See, e.g., Justice Ziegler's dissent, ¶189. The State's decision to appeal this case should not be harshly rebuked because the law in this case is anything but "settled." After five Justices could not reach a consensus in State v. Johnson, 2013 WI 59, 348 Wis. 2d 450, 832 N.W.2d 609 (per curiam) (Johnson I) and Johnson II, the State was left with a messy predicament. As the State explained in its petition for review, it seeks some much needed clarity:

(continued)

15

## II. DISCUSSION

¶17 We begin by briefly discussing the difference between privilege and confidentiality, and the two statutes involved in this case: Wis. Stat. § 905.04 (privilege statute) and Wis. Stat. § 146.82 (confidentiality statute). We then explain why it was improper for the Shiffra/Green court to rely on Ritchie when it created a right to access privileged information via a motion for in camera review. Next, we discuss why Shiffra/Green's right to access privileged information via a motion for in camera review cannot be grounded in any other legal basis, specifically any other constitutional provision. We note that even if there were a right, that right would need to be balanced against § 905.04, the privilege statute. We would analogize this case, which involves access to information, to situations involving the presentation of evidence at trial. A series of opinions from the Supreme Court of the United States instruct that when a defendant seeks to present evidence at trial and is barred by statute from doing so, a court may strike down the statute only when it is arbitrary or disproportionate to the purpose the statute is designed to serve. Here, the privilege statute is neither arbitrary nor disproportionate to the purpose it was

---

To this day, [] this court has never issued a precedential decision addressing—other than in passing—the state's arguments for why Shiffra rests on shaky constitutional ground and should be overruled. This case affords the court the opportunity to have all seven justices weigh in on this extremely important constitutional question.

16

designed to serve. Finally, we end by discussing a few ways defendants can meaningfully present a defense without having access to a complainant's privileged mental health treatment records.

## A. STANDARD OF REVIEW

¶18 This case requires us to interpret and apply the United States Constitution and the Wisconsin Constitution as well as various statutes. "The interpretation of a constitutional provision is a question of law that we review de novo." Appling v. Walker, 2014 WI 96, ¶17, 358 Wis. 2d 132, 853 N.W.2d 888. "The interpretation and application of a statute present questions of law that this court reviews de novo while benefitting from the analyses of the court of appeals and circuit court." State v. Alger, 2015 WI 3, ¶21, 360 Wis. 2d 193, 858 N.W.2d 346.

## B. PRIVILEGE AND CONFIDENTIALITY

¶19 Two statutes, one relating to privilege and one relating to confidentiality, are relevant to the present case. Wisconsin Stat. § 905.04 protects a person's information by making that information privileged: "A patient has a privilege to refuse to disclose and to prevent any other from disclosing confidential communications made or information obtained or disseminated for purpose of diagnosis or treatment . . . ." In contrast, Wis. Stat. § 146.82 protects information by making it confidential: "All patient health care records shall remain confidential." We must be mindful of the difference between privileged information and confidential information:

17

> Although they are separate concepts, the terms privilege and confidentiality are often confused. Privilege is an exception to the general rule that the public has a right to every man's evidence. Confidentiality is an ethic that protects the client from unauthorized disclosure of information about the client by the therapist . . . . The presence of confidentiality alone is not enough to support a privilege. Refusal by a professional to testify in the absence of a privilege may result in a charge of contempt of court against the professional, while a breach of confidentiality may be the subject of a tort action. Confidentiality, therefore, is a professional duty to refrain from speaking about certain matters, while privilege is a relief from the duty to speak in court proceedings.

Catharina J.H. Dubbelday, Comment, The Psychotherapist-Client Testimonial Privilege: Defining the Professional Involved, 34 Emory L.J. 777, 780-81 (1985) (quotation marks and footnotes omitted).

### C. THE COURT OF APPEALS IMPROPERLY RELIED ON RITCHIE WHEN IT INVENTED A RIGHT TO ACCESS PRIVILEGED INFORMATION VIA A MOTION FOR IN CAMERA REVIEW.

¶20 Since much of this case revolves around the Supreme Court of the United State's decision in Ritchie, we begin by reviewing its facts and holding. We then discuss the court of appeals' treatment of Ritchie in the two cases leading up to Shiffra as well as Shiffra.

### 1. The Original In Camera Review Case: Pennsylvania v. Ritchie.

¶21 In Ritchie, the Supreme Court addressed whether and to what extent a state's interest in the confidentiality of its investigative files concerning child abuse must yield to a criminal defendant's Sixth and Fourteenth Amendment rights. Ritchie, 480 U.S. at 42-43. In that case, Pennsylvania created

18

"a protective service <u>agency charged with investigating cases</u> of suspected mistreatment and neglect."[16] <u>Id.</u> at 43 (emphasis added). The defendant was charged with "rape, involuntary deviant sexual intercourse, incest, and the corruption of a minor." <u>Id.</u> The alleged victim of those charges was the defendant's thirteen-year-old daughter. <u>Id.</u> The daughter claimed that she had been assaulted by the defendant two or three times per week over a four year period. <u>Id.</u> After reporting the incidents to the police, the case was referred to the protective agency. <u>Id.</u>

¶22 Prior to trial, the defendant served the protective agency with a subpoena; he sought access to the agency's records concerning his daughter. <u>Id.</u> The protective agency refused to turn over the records, claiming that the records were protected from disclosure under Pennsylvania law. <u>Id.</u> The relevant Pennsylvania statute provided,

> reports made pursuant to this act including but not limited to report summaries of child abuse . . . and written reports . . . as well as any other information obtained, reports written or photographs or x-rays taken concerning alleged instances of child abuse in the possession of the department, a county children and youth social service agency or a child protective service <u>shall be confidential</u> and <u>shall only be made available to</u>:
>
> . . . .
>
> (5) <u>A court</u> of competent jurisdiction <u>pursuant to a court order</u>.

---

[16] The protective agency was called "Children and Youth Services" ("CYS").

19

Id. at n.2 (first two alterations in original) (emphasis added); see also id. at 43-44. To summarize, the statute required that all reports and information obtained in the course of a protective agency's investigation be kept confidential unless a court ordered disclosure.

¶23 The defendant in Ritchie argued that he was entitled to the confidential information because it might contain the names of favorable witnesses as well as exculpatory information. See id. at 55. Moreover, he claimed that the protective agency's refusal to disclose the confidential information violated his constitutional rights, specifically his Sixth Amendment rights to Confrontation and Compulsory Process and his Fourteenth Amendment right to Due Process. See id. at 51-52, 55-56, 57-58. The Court rejected the defendant's arguments under the Sixth Amendment and instead addressed his arguments under the Fourteenth Amendment. Id. at 56 ("[B]ecause our Fourteenth Amendment precedents addressing the fundamental fairness of trials establish a clear framework for review, we adopt a due process analysis for purposes of this case.").

¶24 In conducting its due process analysis, the Court relied exclusively on Brady v. Maryland, 373 U.S. 83 (1963), the case that first established a prosecutor's disclosure obligation, and cases that clarify Brady. Indeed, the first sentence of the Court's due process analysis reads, "It is well[-]settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." Id. at 57

20

(emphasis added). The Court then cited to <u>Brady</u> and <u>United States v. Agurs</u>, 427 U.S. 97 (1976), a case that clarified <u>Brady</u>'s reach. <u>Id.</u> In fact, the only law cited in the Court's due process analysis stems directly from <u>Brady</u>. <u>Id.</u> at 57-58.

¶25 <u>Brady</u> requires, as a prerequisite to disclosure, that the information sought by the defendant be (1) in the prosecutor's possession and (2) both favorable to the accused and material to guilt or punishment. 373 U.S. at 87; <u>see also</u> <u>Ritchie</u>, 480 U.S. at 57. The <u>Ritchie</u> Court readily concluded that the first <u>Brady</u> requirement——that the information be in the prosecutor's possession——was met, so it dove straight into the second requirement——that the information be favorable to the accused and material to guilt or punishment. <u>Ritchie</u>, 480 U.S. at 57. It is clear the <u>Ritchie</u> Court assumed that <u>Brady</u>'s disclosure requirement applied to a state agency involved in <u>investigating</u> the allegations as part of the prosecutorial state function because the Court made quick-work of that requirement. In contrast, the Court grappled with <u>Brady</u>'s materiality requirement:

> At this stage, of course, <u>it is impossible to say whether any information</u> in the [protective agency's] records <u>may be relevant</u> to [the defendant's] claim of innocence, because neither the prosecution nor defense counsel have seen the information, and the trial judge acknowledged that he had not reviewed the full file. The Commonwealth, however, argues that no materiality inquiry is required, because a statute renders the contents of the file [confidential]. Requiring disclosure here, it is argued, would override the Commonwealth's compelling interest in confidentiality on the <u>mere speculation that the file "might" have been useful</u> to the defense.

21

Id. (emphasis added).

¶26 In considering how Brady's materiality standard should apply to speculative, protected information, the Court balanced the defendant's interest in the information against the State's interest in protecting the information:

> Although we recognize that the public interest in protecting this type of sensitive information is strong, we do not agree that this interest necessarily prevents disclosure in all circumstances. This is not a case where a state statute grants [the protective agency] the absolute authority to shield its files from all eyes. Rather, the [state] law provides that the information shall be disclosed in certain circumstances, including when [the protective agency] is directed to do so by court order. Given that the [state] Legislature contemplated some use of [the protective agency's] records in judicial proceedings, we cannot conclude that the statute prevents all disclosure in criminal prosecutions. In the absence of any apparent state policy to the contrary, we therefore have no reason to believe that relevant information would not be disclosed when a court of competent jurisdiction determines that the information is "material" to the defense of the accused.

Id. at 57-58 (emphases added) (citation omitted). Accordingly, the Ritchie Court held that the defendant was entitled to have the protective agency's investigative file reviewed in camera, remarking that if the files "contain[ed] information that probably would have changed the outcome of his trial," then "[the defendant] must be given a new trial." Id. at 58. Thus, the point of the in camera review was to determine whether the files met Brady's second requirement——materiality.

¶27 In sum, there are two key takeaway points from Ritchie. First, Ritchie involved a state statute that made the

22

protective agency's investigative files confidential. But the statute specifically allowed for disclosure per a court order. The Court leaned heavily on this fact in reaching its conclusion, commenting, "the [state] law provides that the information shall be disclosed in certain circumstances, including when [the agency] is directed to do so by court order." Id. at 57-58.

¶28 Second, the protective agency, the entity holding the records, was responsible for "investigating cases of suspected mistreatment and neglect," including the allegations made against the defendant in that case. Id. 42-43. The Ritchie Court considered the "investigative" status of the protective agency important because it cited exclusively to Brady and post-Brady cases, which require the prosecutor to turn over files in his or her possession. The Ritchie Court's actions (summarily skipping over this requirement) demonstrate that the protective agency met Brady's possession requirement because the protective agency performed state investigative and prosecutorial functions.

¶29 And this conclusion makes sense. Since Brady, the Court has held that the prosecutor's Brady obligation extends to "others acting on the government's behalf in the case, including the police." See Kyles v. Whitley, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." (emphasis added)); Strickler v. Greene, 527 U.S. 263, 281 (1999) ("In order to comply with Brady, therefore, 'the individual

23

prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" (citing <u>Kyles</u>, 514 U.S. at 437)). In <u>Ritchie</u>, the state statute charged the relevant protective agency with "<u>investigating</u> cases of suspected mistreatment and neglect." 480 U.S. at 43. There, in particular, the defendant's case was "referred" to the protective agency. <u>Id.</u> In short, it made sense for the Supreme Court to rely on <u>Brady</u> and post-<u>Brady</u> cases in <u>Ritchie</u> because the protective agency was charged with investigating the allegations and was, therefore, acting on the prosecution's behalf. As a result, any material it had was constructively within the possession of the prosecution.

2. Our Court of Appeals Gradual Expansion of <u>Ritchie</u>: <u>In the Interest of K.K.C.</u>, <u>State v. S.H.</u>, and <u>State v. Shiffra</u>.

¶30 Nearly one year after the Supreme Court of the United States decided <u>Ritchie</u>, our court of appeals took up <u>In the Interest of K.K.C.</u>, 143 Wis. 2d 508, 422 N.W.2d 142 (Ct. App. 1988). The court reached the following conclusion regarding <u>Ritchie</u>:

> [The defendant] contends that if the trial judge in his criminal case does not review the agency's files, he will be denied his constitutional rights to confrontation, compulsory process, and due process. <u>Ritchie</u> holds that a criminal defendant is entitled to an in camera review by the trial court of confidential records if those records are material to the defendant's defense.
>
> [The defendant] has not moved the trial court in his criminal case to make an <u>in camera</u> review of the agency records. If he does so, <u>Ritchie</u>, <u>supra</u>, establishes that he is entitled to such a review by

24

> the trial court, provided he makes a preliminary showing that the files contain evidence material to his defense.

In the Interest of K.K.C., 143 Wis. 2d 508, 511, 422 N.W.2d 142 (Ct. App. 1988) (citations omitted). That's the court's entire Ritchie analysis.

¶31 The statute in K.K.C., Wis. Stat. § 48.78(2)(a), provided, "No agency may make available for inspection or disclose the contents of any record kept or information received about any individual in its care or legal custody, except as provided [under other subsections] or by order of the court." Id. at 509-10. Similar to the statute in Ritchie, § 48.78(2)(a) carved out a court order exception. However, unlike in Ritchie, it is unclear whether the County Department of Social Services was "investigating" or "acting on the government's behalf" by assisting the prosecution.

¶32 Two years later, the court of appeals decided State v. S.H., 159 Wis. 2d 730, 465 N.W.2d 238 (Ct. App. 1990). There, the court once again interpreted Ritchie, this time broadly expanding Ritchie's reach. In S.H., the State charged the defendant with twelve counts of first-degree sexual assault. State v. S.H., 159 Wis. 2d 730, 733, 465 N.W.2d 238 (Ct. App. 1990). The alleged victims of those charges were the defendant's three children. Id. Prior to trial, the defendant sought a court order directing the children's counseling center (Directions Counseling Center) to provide him with copies of the children's treatment records. Id. at 734. The counseling center refused to release the records after the children's guardian ad litem

25

claimed the psychologist-patient privilege (Wis. Stat. § 905.04) on behalf of the children. Id. The court of appeals, citing Ritchie and K.K.C., concluded that "if a defendant makes a preliminary showing that the records contain evidence material to his defense, he is entitled to an in camera review by the trial court of those records." Id. at 738. Here is the court of appeals' analysis and application of Ritchie:

> [Ritchie] controls S.H.'s constitutional right to compel disclosure of confidential records. That [C]ourt conducted a due process analysis and concluded that the defendant was entitled to an in camera review by the trial court of confidential records. In Ritchie, the Court struck a balance between the protection of confidential information and the defendant's interest in obtaining exculpatory information. The Court recognized that an in camera review denied the defendant the benefit of an "advocate's eye." However, such review adequately protected the defendant's rights while protecting the confidentiality of the records. Accordingly, if a defendant makes a preliminary showing that the records contain evidence material to his defense, he is entitled to an in camera review by the trial court of those records.

Id. at 737-38 (citations omitted). The court of appeals left out some of Ritchie's crucial features.

¶33 For example, unlike in Ritchie and K.K.C., where the records sought were confidential, the records sought in S.H. were privileged under Wis. Stat. § 905.04. Moreover, unlike the statutes in Ritchie and K.K.C., § 905.04 does not contain an exception allowing for release by court order.

¶34 Additionally, in S.H., a private mental health facility, Directions Counseling Center, held the privileged

26

records. Id. at 733-34. Unlike the protective agency in Ritchie, no facts in the court of appeals' opinion would suggest that Directions Counseling Center was involved in "investigating" the sexual assault allegations or was in any way acting on behalf of the prosecutor. In reaching its conclusion, the court of appeals failed to take notice of these important distinguishing features. Instead, the court incorrectly interpreted Ritchie to mean "that the defendant was entitled to an in camera review by the trial court of confidential records." Id. at 737-38.

¶35 Almost three years later, the court of appeals considered State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993). In Shiffra, the state charged the defendant with second-degree sexual assault. 175 Wis. 2d at 602. Prior to trial, the defendant moved for an order requiring the complainant to reveal to the defendant her "psychiatric history, psychiatric records, and to execute an authorization to release medical information from any doctors, hospitals or counselors seen by [the complainant] . . . ." Id. at 603. The State opposed the motion, arguing that the complainant's records were privileged under Wis. Stat. § 905.04. Despite the State's argument that "th[e] case d[id] not fall within the ambit of Ritchie because [the complainant's] records [were] not in the possession of the prosecution or any other state agency," the court concluded,

> We are bound by Wisconsin precedent, which clearly makes Ritchie applicable to cases in which the information sought by the defense is protected by statute and is not in the possession of the state. See

27

K.K.C., 143 Wis. 2d at 511, 422 N.W.2d at 144 (information sought was confidential); S.H., 159 Wis. 2d at 736, 465 N.W.2d at 240-41 (information sought was protected under sec. 905.04, Stats., and was in the possession of a private counseling center). According to these cases, Shiffra is entitled to an in camera inspection if he meets the burden of making a preliminary showing of materiality. The State contends that S.H. and K.K.C. are not binding because their relevant language is dicta. We do not agree. Both cases unequivocally adopted Ritchie as the law in Wisconsin even when the records are not in the state's possession.

Id. at 606-07.

¶36 To say the court of appeals took some liberties interpreting and applying Ritchie would be an understatement. Over the course of three cases, K.K.C., S.H., and Shiffra, the court of appeals swept into Ritchie's reach privileged records held by entities completely removed from the investigative criminal process. Ritchie——a case concerning confidential records (subject to numerous exceptions) held by the very agency charged with investigating the offense and therefore soundly rooted in Brady——never should have been stretched to cover privileged records held by agencies far removed from investigative and prosecutorial functions. As a result, we conclude that the court of appeals improperly relied on Ritchie when it created a right to access privileged information that is not in the prosecutor's hands via a motion for in camera review.

3. This Court's Adoption of Shiffra.

¶37 This court appears to have first "adopted" the court of appeals' Shiffra test in State v. Solberg, 211 Wis. 2d 372, 564 N.W.2d 775 (1997). We use the term "adopted" loosely because

28

the Solberg court simply parroted Shiffra's test and then cited Shiffra:

> Whether the court of appeals had the authority to examine E.H's records is dependent on whether the circuit court appropriately conducted an in camera inspection of the records. If the circuit court had the authority to review the privileged records, then the court of appeals also had the authority to do so. A circuit court should conduct an in camera review of privileged medical records when the defendant makes "a preliminary showing that the sought-after evidence is material to his or her defense," and the privilege holder consents to review of those records.

State v. Solberg, 211 Wis. 2d 372, ¶16, 564 N.W.2d 775 (1997) (footnote omitted) (quoting Shiffra, 175 Wis. 2d at 605). The Solberg court's singular string of reasoning for such a rule was its "belie[f] that giving the defendant an opportunity to have the circuit court conduct an in camera review of the privileged records, while still allowing the patient to preclude review, addresse[d] both the interests of the defendant and the patient." Id., ¶23. In essence, Shiffra seemed fair enough to the Solberg court.

¶38 We also considered Shiffra in State v. Rizzo, 2002 WI 20, 250 Wis. 2d 407, 640 N.W.2d 93. Similar to the court in Solberg, the Rizzo court applied Shiffra without any analysis of Shiffra or its foundation. Here is the Rizzo court's application of Shiffra:

> We do no adopt Rizzo's position because it would eviscerate the procedure for in camera review set forth in Shiffra, which protects a victim's confidential records. In effect, Rizzo's position would provide that the defendant must receive full access to the victim's treatment records in every case

29

in order to effectively cross-examine an expert who treated the victim. That is in stark contrast to the in camera procedure under Shiffra, which specifically balanced the victim's interest in confidentiality against the constitutional rights of the defendant.

State v. Rizzo, 2002 WI 20, ¶53, 250 Wis. 2d 407, 640 N.W.2d 93 (citing Shiffra, 175 Wis. 2d at 609-10).

¶39 Finally, in State v. Green, this court modified Shiffra's standard for obtaining an in camera review. The Green court's consideration of whether Shiffra was good law is as follows:

> The State contends that the holding in [Shiffra] was in error because it relied on [Ritchie]. The State argues that Ritchie was distinguishable and therefore inapplicable because it involved a situation, unlike here, where the records were in the government's possession. The Shiffra court, however, specifically rejected this argument, concluding that it was bound by Wisconsin precedent, which clearly made Ritchie applicable in cases where the information sought by the defense is not in the possession of the state. Shiffra, 175 Wis. 2d at 606-07, 499 N.W.2d 719 (citing State v. S.H., 159 Wis. 2d 730, 736, 465 N.W.2d 238 (Ct. App. 1990), and In re K.K.C., 143 Wis. 2d 508, 511, 422 N.W.2d 142 (Ct. App. 1988)). This court recognized the validity of Shiffra in [Solberg] and [Rizzo]. We will not depart from this precedent.

Green, 253 Wis. 2d 356, ¶21 n.4.[17] To put it bluntly, Shiffra

---

[17] The dissent repeatedly uses this footnote in Green to proclaim that we have expressly declined to overrule Shiffra. See Justice Ziegler's dissent, ¶190; see also Justice Prosser's dissent, ¶167. In reality, this footnote shows that courts have continued to blindly adhere to poorly reasoned cases solely because they have felt compelled to do so. Any one of these courts along the way could have at least attempted to address the State and answer the question of whether a defendant has a constitutional right to access privileged information, and if so, what the basis of that right is. None did. We cannot continue to pass the buck. We must roll up our sleeves and dig

(continued)

30

kept the balancing test invented by the court of appeals in S.H. and K.K.C. because it felt "bound by precedent," and this court kept Shiffra because Solberg and Rizzo appeared to apply it. This is the untenable foundation upon which Shiffra was built and now rests. We will not rubber stamp the Shiffra test solely because it has been inexplicably applied.[18]

_____

into the law. Interpreting the Constitution is, after all, the ultimate responsibility of this court. See Powell v. McCormack, 395 U.S. 486, 521 (1969).

[18] The dissent relies on Kimble v. Marvel Entertainment, LLC, 576 U.S. __, 135 S. Ct. 2401 (2015) for the proposition that "an argument that we got something wrong—even a good argument to that effect—cannot by itself justify scrapping settled precedent." Justice Ziegler's dissent, ¶208. Kimble is a statutory interpretation case. Accordingly, in Kimble, the Supreme Court of the United States discussed stare decisis in the context of statutory interpretation:

> What is more, stare decisis carries enhanced force when a decision . . . interprets a statute. Then, unlike in a constitutional case, critics of our ruling can take their objections across the street, and Congress can correct any mistake it sees. . . . All of interpretive decisions, in whatever way reasoned, effectively become part of the statutory scheme, subject (just like the rest) to congressional changes. Absent special justification, they are balls tossed into Congress's court, for acceptance or not as that branch elects.

Kimble v. Marvel Entm't, LLC, 576 U.S. __, 135 S. Ct. 2401, 2409 (2015) (emphasis added).

Even Kimble's "general" discussion of the law speaks to stare decisis in the context of statutory interpretation, as it cites to Justice Brandeis's dissent in Burnet v. Coronado Oil & Gas Co., 285 U.S. 393 (1932). Burnet explains,

> Stare decisis is usually the wise policy, because in most matters it is more important that the applicable

(continued)

31

rule of law be settled than that it be settled right. This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation. But in cases involving the Federal Constitution, where correction through legislative action is practically impossible, this court has often overruled its earlier decisions. The court bows to the lessons of experience and the force of better reasoning . . . .

Id., 285 U.S. at 406-08 (Brandeis, J., dissenting) (citations omitted).

It is important to recognize the distinction between statutory interpretation and constitutional interpretation. As noted by the Supreme Court, "unlike in a constitutional case," critics of a statutory interpretation case can take their objections to the Legislature, and it can then can "correct any mistake it sees." Id. (emphasis added); see also Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 954-55 (1992) (Rehnquist, C.J., concurring in part, dissenting in part) ("Erroneous decisions in [] constitutional cases are uniquely durable, because correction through legislative action, save for constitutional amendment, is impossible. It is therefore our duty to reconsider constitutional interpretations that depart from a proper understanding of the Constitution." (quotation marks and citations omitted)). In declaring that a defendant has a constitutional right in this case, the dissenters remove the issue from public discussion and legislative action. See Obergefell v. Hodges, 576 U.S. __, 135 S. Ct. 2584, 2625 (2015) (Roberts, C.J., dissenting) ("By deciding this question under the Constitution, the Court removes it from the realm of democratic decision. There will be consequences to shutting down the political process on an issue of such profound public significance. Closing debates tends to close minds.").

Moreover, the Supreme Court of the United States has overruled precedent when the precedential case was "badly reasoned." See Payne v. Tennessee, 501 U.S. 808, 827 (1991) ([W]hen governing decisions are unworkable or badly reasoned, 'this court has never felt constrained to follow precedent.'" (citing Smith v. Allwright, 321 U.S. 649, 665 (1944) (emphasis added))); Arizona v. Gant, 556 U.S. 332, 348 (2009) ("The doctrine of stare decisis is of course 'essential to the respect accorded to the judgments of the Court and to the stability of the law,' but it does not compel us to follow a past decision

(continued)

We therefore undertake to consider whether there is any legal basis in which Shiffra can properly be grounded.[19]

## D. NEITHER THE SIXTH AMENDMENT NOR THE FOURTEENTH AMENDMENT GUARANTEE A DEFENDANT THE RIGHT TO ACCESS PRIVILEGED INFORMATION VIA A MOTION FOR IN CAMERA REVIEW.

¶40 We turn now to discuss whether there is any other legal basis for creating a right to access privileged

---

when its rationale no longer withstands 'careful analysis.'" (emphasis added) (quoting Lawrence v. Texas, 539 U.S. 558, 577 (2003)); Gant, 556 U.S. at 353 (Scalia, J., concurring) ("Justice Alito insists that the Court must demand a good reason for abandoning prior precedent. That is true enough, but its seems to me ample reason that the precedent was badly reasoned and produces erroneous (in this case unconstitutional) results."); Montejo v. Louisiana, 556 U.S. 778, 792-73 (commenting that "[b]eyond workability, the relevant factors in deciding whether to adhere to the principle of stare decisis include the antiquity of the precedent, the reliance interests at stake, and of course whether the decision was well reasoned," and noting that the precedential opinion there was "only two decades old" so "eliminating it would not upset expectations") (emphasis added)); see Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 378 (2010) (Roberts, C.J., concurring) ("When considering whether to reexamine a prior erroneous holding, we must balance the importance of having constitutional questions decided against the importance of having them decided right.").

[19] In case this point has not been made abundantly clear in the 15 pages detailing the countless inadequacies of Shiffra/Green, Shiffra/Green was wrongly decided, is unsound in principle, and should, therefore, be overruled. See Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶¶98-99, 264 Wis. 2d 60, 665 N.W.2d 257 (overruling precedent and outlining a series of concerns a court should consider when overturning prior case law, including "whether the prior case was correctly decided," and "whether the prior decision is unsound in principle"); see also id., ¶100 ("We do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision.").

33

information via a motion for in camera review. An analysis of other cases tackling this topic reveals that defendants have consistently argued that three constitutional provisions——the Sixth Amendment's Confrontation Clause and Compulsory Process Clause and the Fourteenth Amendment's Due Process Clause——give rise to a right to access privileged information via a motion for in camera review. See, e.g., Indiana v. Fromme, 949 N.E.2d 789, 795 (Ind. 2011). Each provision will be discussed in turn below.

1. The Sixth Amendment's Confrontation Clause.

¶41 The United States Constitution provides, "In all criminal prosecutions the accused shall enjoy the right . . . to be confronted with witnesses against him . . . ." U.S. Const. amend. VI.[20] The Supreme Court of the United States has explained, "The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination. Ritchie, 480 U.S. at 51 (plurality opinion).[21]

¶42 A plurality of the Supreme Court has specifically considered——and rejected——the argument that "by denying [a

---

[20] The Wisconsin Constitution provides, "In all criminal prosecutions the accused shall enjoy the right . . . to meet witnesses face to face . . . ." Wis. Const. art. I, § 7.

[21] Justice Powell's discussion of the Confrontation Clause in Ritchie garnered a plurality of the Court. 480 U.S. at 42. Justice Powell's discussion of the Compulsory Process Clause and the Due Process Clause garnered a majority of the Court. Id.

34

defendant] access to the information necessary to prepare his defense, the trial court interfered with [a defendant's] right of cross-examination." Id. In Ritchie, the Court commented on the limited nature of a defendant's right to cross-examination: "The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." Id. at 53. Moreover, the Court went on to add, "If we were to accept this broad interpretation . . . , the effect would be to transform the Confrontation Clause into a constitutionally compelled rule of pretrial discovery. Nothing in the case law supports such a view. The opinions of this Court show that the right to confrontation is a trial right . . . ." Id. at 52 (first emphasis added). Thus, the right to cross examine witnesses is satisfied when "defense counsel receives wide latitude at trial to question witnesses." Id. at 53 n.9 ("[T]he Confrontation Clause only protects a defendant's trial rights[; it] does not compel the pretrial production of information that might be useful in preparing for trial.").

¶43  Similar to the defendant in Ritchie, Lynch's argument would be that the court interfered with his ability to most effectively cross examine the complainant by denying him access to the complainant's privileged mental health treatment records. A plurality of the Supreme Court has already rejected this argument, and we reject this argument now. Lynch's right to cross examination will be satisfied so long as he has the opportunity to cross examine the complainant at trial.

2. The Sixth Amendment's Compulsory Process Clause.

¶44 The United States Constitution provides, "In all criminal prosecutions the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI.[22] The Supreme Court of the United States has explained that the Compulsory Process Clause grants a defendant the "right to offer the testimony of witnesses, and to compel their attendance, if necessary . . . ." Washington v. Texas, 388 U.S. 14, 19 (1967); see also Ritchie, 480 U.S. at 56 (majority opinion) ("Our cases establish, at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." (emphasis added)).

¶45 In State v. Schaefer, 2008 WI 25, 308 Wis. 2d 279, 746 N.W.2d 457, we analyzed the Ritchie Court's treatment of the Compulsory Process Clause, specifically taking notice of the Supreme Court's "reluctan[ce] to establish an unconditional discovery right under the Sixth Amendment." Id., ¶66. In Ritchie, the Court reiterated that it "has never squarely held that the Compulsory Process Clause guarantees the right to discover the identity of witnesses, or to require the government to produce exculpatory evidence." Ritchie, 480 U.S. at 56

---

[22] The Wisconsin Constitution provides, "In all criminal prosecutions the accused shall enjoy the right . . . to have compulsory process to compel the attendance of witnesses in his behalf . . . ." Wis. Const. art. I, § 7.

36

(emphasis omitted). Consequently, the Court chose to forego a Sixth Amendment analysis and instead opted for a Fourteenth Amendment Due Process analysis. Id. It explained, "Although we conclude that compulsory process provides no greater protections in this area than those afforded by due process, we need not decide today whether and how the guarantees of the Compulsory Process Clause differ from those of the Fourteenth Amendment." Id. In Schaefer, we interpreted the Court's statement in Ritchie to mean that "unless due process required defense access to specific evidence, the Compulsory Process Clause cannot provide substitute authority for such access." Schaefer, 308 Wis. 2d 279, ¶66. Following the Supreme Court's lead, we move on to consider whether the Due Process Clause guarantees a defendant the right to access privileged information via a motion for in camera review.[23]

---

[23] For a discussion on the interplay between the Compulsory Process Clause and the Due Process Clause, see Stacey Kime, Note, Can A Right Be Less Than The Sum Of Its Parts? How The Conflation Of Compulsory Process and Due Process Guarantees Diminished Criminal Defendants Rights, 48 Am. Crim. L. Rev. 1501 (2011) and Sanjay Chhablani, Disentangling The Sixth Amendment, U. Pa. J. Const. L. 487, 523-29 (2009). Both law review articles advocate for a separation of the two constitutional provisions: "The rights under the Compulsory Process Clause provide the structure for a fair trial . . . while the Due Process Clause governs the fairness of the trial itself . . . ." Stacey Kime, Note, Can A Right Be Less Than The Sum Of Its Parts? How The Conflation Of Compulsory Process and Due Process Guarantees Diminished Criminal Defendants Rights, 48 Am. Crim. L. Rev. 1501, 1524 (2011); see also Sanjay Chhablani, Disentangling The Sixth Amendment, U. Pa. J. Const. L. 487, 527-28 (2009) ("[W]hile the Compulsory Process Clause gives defendants the right to the issuance of subpoenas for compelling a witness's attendance in court, once that witness shows up, it is the Due
(continued)

3. The Fourteenth Amendment's Due Process Clause.

¶46 The United States Constitution provides, "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ." U.S. Const. amend. XIV.[24] Due Process requires that criminal prosecutions comport with "prevailing notions of fundamental fairness." California v. Trombetta, 467 U.S. 479, 485 (1984). Fundamental fairness necessitates that "criminal defendants be afforded a meaningful opportunity to present a complete defense." Id. However, the right to present a complete defense has never been interpreted to include a general right to access (or discover) information in a criminal case. To the contrary, the Supreme Court has consistently recognized that "there is no general constitutional right to discovery in a criminal case . . . ." Ritchie, 480 U.S. at 59-60 (quoting Weatherford v. Bursey, 429 U.S. 545, 559 (1977)).

¶47 We too have held that there is no general constitutional right to access information in criminal cases. See State v. Miller, 35 Wis. 2d 454, 151 N.W.2d 157 (1967); see also Britton v. State, 44 Wis. 2d 109, 170 N.W.2d 785 (1969)

---

Process Clause that addresses whether the witness will be allowed to testify.").

[24] The Wisconsin Constitution provides, "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty, and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." Wis. Const. art. I, § 1.

("Discovery has been left to rule-making power and has not been deemed a constitutional issue."). Accordingly, a defendant is entitled to access information only to the extent outlined in Wis. Stat. § 971.23, our criminal discovery statute. Schaefer, 398 Wis. 2d 279, ¶77 n.17 ("[T]he scope of discoverable materials is set out in statute and compliance with the statute will be enforced by the court."); see also Miller, 35 Wis. 2d at 474 ("[I]t has been held that unless introduced by appropriate legislation, the doctrine of discovery is a complete and utter stranger to criminal procedure." (quoting 23 C.J.S. Criminal Law § 955(1), p. 787)).[25]

¶48 Of course, "[s]tatutory discovery is conceptually distinct from the prosecution's constitutionally-mandated duty to disclose exculpatory evidence" under Brady. 9 Wis. Prac., Criminal Practice & Procedure § 22:1 (2d ed.); see also Miller,

---

[25] Of course, the Supreme Court of the United States could decide to create a due process right to access privileged information, in which case, we would naturally follow the Supreme Court's directive. To date, the Supreme Court has not recognized a due process right to access privileged information. See California v. Trombetta, 467 U.S. 479, 486 (explaining that the Court has allowed some access to information when a prosecutor uses his or her "sovereign powers" to "hamper" a defendant's trial, but purposely leaving open the question of whether "the Due Process Clause . . . guarantee[s] criminal defendants access to exculpatory evidence beyond the government's possession" (emphasis added)); see also People v. Hammon, 938 P.2d 986 (Cal. 1997) ("We do not, however, see an adequate justification for taking such a long step in a direction the United States Supreme Court has not gone.").

35 Wis. 2d at 474-78; Britton, 44 Wis. 2d at 117-18; Schaefer, 308 Wis. 2d 279, ¶¶22-23. In Britton, we explained,

> A distinction must be made between "disclosure" and "discovery." Discovery emphasizes the right of the defense to obtain access to evidence necessary to prepare its own case, while disclosure concerns itself with the duty of the prosecution to make available to the accused evidence and testimony which, as a minimum standard, is exculpatory based on constitutional standards of due process. Discovery has been left to rule-making power and has not been deemed a constitutional issue. On the other hand, disclosure, or the failure to disclose, is a constitutional issue to be decided on a case by case basis . . . .

Britton, 44 Wis. 2d at 117-18 (emphasis added).

¶49 A prosecutor's constitutionally-mandated duty to disclose arises out of the Supreme Court of the United State's decision in Brady. In Brady, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87 (emphasis added). The Court reasoned, "A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice . . . ." Id. at 87-88 (emphasis added). Stated otherwise, a defendant is treated unfairly when a prosecutor hides favorable evidence from a defendant.

40

¶50 The Supreme Court of the United States has consistently limited Brady's disclosure requirement to the prosecutor and to others acting on the prosecutor's behalf. See Kyles, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." (emphasis added)); Strickler, 527 U.S. at 281 ("In order to comply with Brady, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in this case, including the police.'" (citing Kyles, 514 U.S. at 437)). For example, in Pitonyak v. Stephens, 732 F.3d 525 (5th Cir. 2013), the Fifth Circuit, recognizing Brady's limitation, held that the prosecution's Brady requirement did not extend to "a jail counselor" because the counselor was "not involved in investigating or preparing the case against [the defendant]." Id. at 531, 533.

¶51 And in Illinois v. C.J., 652 N.E.2d 315 (Ill. 1995), the Supreme Court of Illinois held that "where [the Division of Child Family Services] acts at the behest of and in tandem with the State's Attorney, with the intent and purpose of assisting the prosecutorial effort, DCFS functions as an agent of the prosecution," and is therefore subject to Brady's disclosure requirement. Id. at 318. However, because "there was no evidence to support the conclusion that the DCFS investigator [there] functioned, intentionally or otherwise, as an aid in the prosecution of the case," the prosecutor's Brady requirement did not extend to that particular DCFS agent. Id.

41

¶52 For comparison, in Commonwealth v. Bing Sial Liang, 747 N.E.2d 112 (Mass. 2001), the Supreme Judicial Court of Massachusetts held that a victim advocate's notes fell within the prosecutor's Brady requirement because "[a]dvocates are included in the statute's definition of 'prosecutor' and generally are employees of the prosecution." Id. at 116. The Court went on to say, "advocates are paid by the various district attorney[s'] offices [and] work closely with the prosecutors developing cases.' Clearly the Legislature views advocates as part of the prosecution team." Id. (alterations in original) (citations omitted).

¶53 Notably, both the Seventh and Eighth Circuits have rejected defendants' attempts to subpoena treatment records in preparation for trial despite the defendants' assertions that withholding the information would deprive them of a fair trial. United States v. Hach, 162 F.3d 937 (7th Cir. 1998); United States v. Skorniak, 59 F.3d 750 (8th Cir. 1995). In Hach, the defendant sought a witness's "medical and psychiatric records for purposes of conducting an in camera review, and ultimately to release them to him for use in cross-examination." 162 F.3d at 946. In denying the defendant's request, the Seventh Circuit noted,

> [The defendant's] attempt to bootstrap onto Ritchie suffers from a grave[] problem—the evidence is not and never was in the government's possession. As the Eighth Circuit noted in United States v. Skorniak, a failure to show that the records a defendant seeks are in the government's possession is fatal to the defendant's claim. . . . [I]f the documents are not in

42

> the government's possession, there can be no "state action" and consequently, no violation of [the] Fourteenth Amendment.

Id. at 947 (emphasis added). Simply, because the records were not held by the prosecutor or an entity acting on behalf of the prosecutor, the defendant was not entitled to disclosure of the records.

¶54 To summarize, a defendant has a right to present a meaningful defense, but this right is not limitless. It does not include a constitutional right to access privileged information via a motion for in camera review. Discovery is purely statutory; accordingly, a defendant's right to obtain information is to be found in Wis. Stat. § 971.23. In contrast, a defendant has a constitutional right, under Brady, to material information but only when that information is held by the prosecutor, including others acting on the prosecutor's behalf. Outside of the prosecution's limited disclosure requirement, there is no constitutional right to access information. Weatherford, 429 U.S. at 559 ("There is no general constitutional right to discovery in a criminal case, and Brady did not create one.").

¶55 Here, there is nothing to show that the complainant's private mental health facility was acting on behalf of the prosecutor. Unlike in Ritchie and Bing Sial Ling, the complainant's mental health facility was not statutorily created for the purpose of "investigating" crime. Additionally, there are no facts in the record that would indicate that the facility was acting on behalf of or in tandem with the prosecutor.

43

Consequently, this case does not implicate Brady. In sum, Lynch has no right to access the complainant's privileged treatment information via a motion for in camera review because there is no constitutional right to access information and because the information does not fall under Brady's limited disclosure obligation.[26]

E. EVEN IF THERE WERE A RIGHT TO ACCESS PRIVILEGED INFORMATION VIA A MOTION FOR IN CAMERA REVIEW, THAT RIGHT WOULD NEED TO BE BALANCED AGAINST WIS. STAT. § 905.04, THE PRIVILEGE STATUTE.

¶56 We have concluded that a defendant has no Sixth or Fourteenth Amendment right to access privileged information via a motion for in camera review. However, even if there were such a right, that right would still need to be balanced against Wis. Stat. § 905.04, the privilege statute. We would analogize this case, which involves access to information, to cases involving the presentation of evidence at trial. We do so because even if a defendant cannot gain pre-trial access to information, the defendant may still seek to present evidence (in the form of the complainant's testimony) at trial. See Goldsmith v. State, 651 A.2d 866, 874 (Md. 1995) (distinguishing between a defendant's

---

[26] Other states have reached the same conclusion. See, e.g., Indiana v. Fromme, 949 N.E.2d 789 (Ind. 2011); People v. Hammon, 938 P.2d 986 (Cal. 1997); Dill v. People, 927 P.2d 1315 (Colo. 1996); State v. Percy, 548 A.2d 408 (Vt. 1988); Commonwealth v. Wilson, 602 A.2d 1290 (Pa. 1992); United States v. Shrader, 716 F.Supp 2d 464 (S.D. W. Va. 2010); New Jersey v. E.P., 559 A.2d 447 (N.J. Super. Ct. App. Div. 1989) (holding that the defendant had no right to in camera review of information protected by attorney-client privilege).

44

right of access to information during pre-trial discovery and a defendant's right at trial to present a defense).

¶57 The Supreme Court of the United States has recognized "the right of the defendant to present evidence." Taylor v. Illinois, 484 U.S. 400, 409 (1988) (emphasis added). In Washington v. Texas, 388 U.S. 14 (1967), the Court stated,

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

Id. at 19. However, the Court has also recognized that a defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor, 484 U.S. at 410 (emphasis added). Accordingly, a defendant's right to present evidence must be balanced against other considerations. See Rock v. Arkansas, 483 U.S. 44, 55-56 (1987) ("Of course, the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" (quoting Chambers v. Mississippi, 410 U.S. 284, 295 (1973)).

¶58 Over a series of cases,[27] the Supreme Court has developed a test for determining when a defendant's right to present evidence is violated: "[T]he exclusion of defense evidence abridge[s] an accused's right to present a defense 'where the restriction is arbitrary or disproportionate to the purposes' [it is] designed to serve, and the evidence implicate[s] a sufficiently weighty interest of the accused." Harris v. Thompson, 698 F.3d 609, 626 (7th Cir. 2012) (alterations in original) (quoting United States v. Scheffer, 523 U.S. 303, 308-09 (1998) (quoting Rock, 483 U.S. at 56)).

¶59 For instance, in Washington v. Texas, the Court struck down a state statute that barred the introduction of an alleged accomplice's testimony. In declaring the statute unconstitutional, the Court called the rule "arbitrary,"

---

[27] See Washington v. Texas, 388 U.S. 14, 22-23 (1967) (striking down an "arbitrary" law that disqualified an alleged accomplice from testifying on the behalf of the defendant); Chambers v. Mississippi, 410 U.S. 284, 296 n.8, 302 (1973) (striking down a "archaic, irrational, and potentially destructive" common-law rule that prevented the defendant from impeaching his own witness); Rock v. Arkansas, 483 U.S. 44, 55, 61 (1987) (applying the arbitrary and disproportionate test, and striking down a "per se" rule that excluded the defendant's hypnotically refreshed testimony because the rule "arbitrarily" excluded material evidence and because the State had not "justified the exclusion of all of [the] defendant's testimony"); Taylor v. Illinois, 484 U.S. 400, 414-16 (1988) (applying the arbitrary and disproportionate test, and upholding the trial judge's determination that the appropriate sanction for the defendant's discovery violation was to exclude the witness's testimony); Holmes v. South Carolina, 547 U.S. 319, 330-31 (2006) (applying the arbitrary and disproportionate test, and striking down the State's rule barring third-party guilt evidence).

specifically commenting that "[t]he rule disqualifying an alleged accomplice from testifying on behalf of the defendant cannot even be defended on the ground that it rationally sets apart a group of persons who are particularly likely to commit perjury." Washington v. Texas, 388 U.S. at 22 (emphasis added). Accordingly, the Court held that the statute "arbitrarily denied [the defendant] the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." Id. at 23 (emphasis added). In a footnote, the Court was careful to clarify that "[n]othing in [its] opinion should be construed as disapproving testimonial privileges, . . . which are based on entirely different considerations . . . ." Id. at 23 n.21.

¶60  Chambers v. Mississippi serves as another example. In Chambers, the Court analyzed Mississippi's common-law rule that "a party may not impeach his own witness." 410 U.S. at 295. The Court evaluated the basis for such a rule: "The rule rests on the presumption——without regard to the circumstances of the particular case——that a party who calls a witness 'vouches for his credibility.'" Id. at 295 (citation omitted). As part of its analysis, the Court remarked that the rule had been condemned by other sources as "archaic, irrational, and potentially destructive of the truth-gathering process." Id. at 296 n.8. Moreover, the Court took notice of the fact that "Mississippi ha[d] not sought to defend the rule or explain its rationale. Nor ha[d] it contended that its rule should override the

47

accused's right of confrontation." Id. at 297. As a result, the Court concluded that the State's rule denied the defendant an opportunity to present a complete defense. Id. at 302-03.

¶61 To summarize, the "mere invocation" of a constitutional right "cannot automatically and invariably outweigh countervailing public interests." Taylor, 484 U.S. at 414. Thus, a defendant's right to present a meaningful defense is violated only when a rule or statute infringes upon a "weighty interest of the accused" and is "arbitrary" or "disproportionate to the purpose[] [it is] designed to serve." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotation marks omitted) (quoting Scheffer, 523 U.S. at 308).

¶62 Here, Wis. Stat. § 905.04, the privilege statute, is neither arbitrary nor disproportionate to the purpose it is designed to serve. We have stressed that the "public policy underpinning the privilege is to encourage patients to freely and candidly discuss medical concerns with their physicians by ensuring that those concerns will not unnecessarily be disclosed to a third person." Steinberg v. Jensen, 194 Wis. 2d 439, 459, 534 N.W.2d 361 (1995).[28]

---

[28] One court has noted,

The rationale for the psychologist-client privilege was cogently stated in an Advisory Committee Note to Proposed Federal Rule of Evidence 504:

Among physicians, the psychiatrist has a special need to maintain confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it

(continued)

48

¶63 Additionally, the Supreme Court of the United States has recognized a federal psychotherapist privilege. <u>Jaffee v. Redmond</u>, 518 U.S. 1, 18 (1996). Throughout its opinion adopting the privilege, the Court strongly emphasized the importance of such a privilege:

<u>Effective psychotherapy, by contrast, depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclose of facts, emotions, memories, and fears.</u> Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, <u>the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment</u>.

<u>Id.</u> at 10 (emphasis added). Moreover, the Court stressed,

---

difficult if not impossible for him to function without being able to assure his patients confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule . . . , there is wide agreement that confidentiality is a <u>sine qua non</u> for successful psychiatric treatment. The relationship may well be likened to that of the priest-penitent or the lawyer-client. Psychiatrists not only explore the very depths of their patient's conscious, but their unconscious feelings and attitudes as well. Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely. A threat to secrecy blocks successful treatment.

<u>Commonwealth v. Kyle</u>, 533 A.2d 120, 126 (Pa. Super Ct. 1987) (alterations in original) (quoting Report No. 45, Group for the Advancement of Psychiatry 92 (1960), <u>quoted in</u> Advisory Committee's Notes to Proposed Rules, 56 F.R.D. at 242); <u>see also</u> <u>Commonwealth v. Wilson</u>, 602 A.2d 1290, 1295 (Pa. 1992) (citing <u>Kyle</u> and approving of its holding).

> Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege. As we explained in [another case], if the purpose of the privilege is to be served, the participants in the confidential conversation "must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."

Id. at 17-18 (emphasis added) (quoting Upjohn Co. v. United States, 449 U.S. 383, 393 (1981)). In short, Wis. Stat. § 905.04, the privilege statute, serves the crucial purpose of ensuring that individuals——especially individuals who may be suffering as a result of a traumatic experience, like sexual assault——can freely and openly communicate with and be treated by their mental health provider. See United States v. Shrader, 716 F. Supp. 2d 464, 473 (S.D. W. Va. 2010) ("[F]or [this victim] and other alleged stalking victims to have to choose whether to obtain counseling knowing that their alleged stalkers can subpoena the records thereof would be no choice at all. This chilling effect is precisely what the Supreme Court foresaw and explicitly rejected in Jaffee.").[29] Accordingly, § 905.04, the

---

[29] See also State v. Percy, 548 A.2d 408, 415 (Vt. 1988) ("We are particularly solicitous of the need of a victim of a sexual assault to seek and receive mental health counseling without fear that her statements will end up in the public record . . . . We are unwilling to require the victim to forego counseling or risk disclosure absent the most compelling justification——none has been asserted here.").

50

privilege statute, is not arbitrary or disproportionate to the purpose it was designed to serve.

### F. THE SIMPLE REMEDY IF THE PEOPLE OF WISCONSIN WANT A BALANCING TEST: HAVE THE LEGISLATURE AMEND WIS. STAT. § 905.04 TO INCLUDE AN EXCEPTION.

¶64 Over the years, the Legislature has amended Wis. Stat. § 905.04, the privilege statute, numerous times, so the Legislature can, if it wants, amend § 905.04 to include a Shiffra/Green-like balancing test. Thus, should our interpretation and application of § 905.04 and the Constitution represent an "undesired result, the legislature may rectify the situation" by amending § 905.04 to include a Shiffra/Green-like balancing test as an exception to the general privilege rule. Hamilton v. Hamilton, 2003 WI 50, ¶49, 261 Wis. 2d 458, 661 N.W.2d 832.

¶65 For example, Iowa's privilege statute contains a Shiffra/Green-like exception to its general privilege rule. Iowa Code § 622.10(4) states,

a. Except as otherwise provided in this subsection, the confidentiality privilege under this section shall be absolute with regard to a criminal action and this section shall not be construed to authorize or require the disclosure of any privileged records to a defendant in a criminal action unless either of the following occur:

(1) The privilege holder voluntarily waives the confidentiality privilege

(2)(a) The defendant seeking access to privileged records under this section files a motion demonstrating in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any

51

other source and for which there is a compelling need for the defendant to present a defense in the case. Such a motion shall be filed not later than forty days after arraignment under seal of the court. Failure of the defendant to timely file such a motion constitutes a waiver of the right to seek access to privileged records under this section, but the court, for good cause shown, may grant relief from such a waiver.

(b) Upon a showing of reasonable probability that the privileged records sought may likely contain exculpatory information that is not available from any other source, the court shall conduct an in camera review of such records to determine whether exculpatory information is contained in such records.

(c) If exculpatory information is contained in such records, the court shall balance the need to disclose such information against the privacy interest of the privilege holder.

(d) Upon the court's determination, in writing, that the privileged information sought is exculpatory and that there is a compelling need for such information that outweighs the privacy interest of the privilege holder, the court shall issue an order allowing the disclosure of only those portions of the records that contain the exculpatory information. The court's order shall also prohibit any further dissemination of the information to any person, other than the defendant, the defendants' attorney, and the prosecutor, unless otherwise authorized by the court.

b. Privileged information obtained by any means other than as provided in paragraph "a" shall not be admissible in any criminal action.

In simpler terms, Iowa allows a defendant to make a motion "demonstrating in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case." Iowa Code § 622.10(4)(2)(a). If the defendant meets

52

the requisite showing, "the court shall conduct an in camera review of such records to determine whether exculpatory information is contained in such records." Iowa Code § 622.10(4)(2)(b). Should the in camera review of the records reveal exculpatory information, the court must next "balance the need to disclose such information against the privacy interest of the privilege holder." Iowa Code § 622.10(4)(2)(c). If "there is a compelling need for such information that outweighs the privacy interest of the privilege holder," then the court must "issue an order allowing the disclosure of only those portions of the records that contain the exculpatory information." Iowa Code § 622.10(4)(2)(d).

¶66 In short, even though there is no constitutional basis for Shiffra/Green, the Legislature could, if it wanted to, give a defendant access to privileged information by following Iowa's lead and amending Wisconsin's privilege statute.[30] See Bostco LLC v. Milwaukee Metro. Sewerage Dist., 2013 WI 78, ¶61, 350 Wis. 2d 554, 835 N.W.2d 160 ("When a statute [does not] to address a particular situation, the remedy for the omission does not lie with the courts. It lies with the legislature.").

G. THE OPPORTUNITY TO PRESENT A MEANINGFUL DEFENSE.

¶67 Before we conclude, we note that defendants will certainly have an opportunity to present a meaningful defense

---

[30] In addition to Iowa, Kentucky and Massachusetts have some type of exception that would allow a court to conduct an in camera review of a person's privileged mental health treatment records. See Ky. R. Evid. 506(d)(2); Mass. R. Evid. 503(d)(8).

without having access to privileged information via a motion for in camera review.

¶68 First, all defendants are presumed innocent until proven guilty. Taylor v. Kentucky, 436 U.S. 478, 483 (1978) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." (quoting Coffin v. United States, 156 U.S. 432, 453 (1895)).

¶69 Second, all defendants have the right to physically confront and cross-examine witnesses as well as have the right to compel the attendance of witnesses at trial. See Ritchie, 480 U.S. at 51; Washington v. Texas, 388 U.S. at 19.

¶70 Third, the prosecutor and those acting on behalf of the prosecution have a constitutionally-mandated duty to disclose to the defendant exculpatory evidence under Brady. See Brady, 373 U.S. at 87.

¶71 Fourth, a defendant could call other witnesses and have them testify about the complainant's character for truthfulness. See Wis. Stat. § 906.08 ("Except as provided in s. 972.11(2), the credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion, but subject to the following limitations: (a) The evidence may refer only to character for truthfulness or untruthfulness. . . . ").

¶72 Finally, Wisconsin and many other states have mandatory reporting laws. See Wis. Stat. § 48.981(2). These laws mandate that certain persons who have contact with a child

54

report abuse. Id. For example, § 48.981(2m)(c)-(d), requires a "health care provider who provides any health care services to a child" or a "person who obtains information about a child who is receiving or has received health care services from a health care provider" to "report as required . . . if he or she has any reason to suspect . . . [t]hat the child, because of his or her age or immaturity, was or is incapable of understanding the nature or consequences of sexual intercourse or sexual contact." A defendant could ask a treatment provider who would have been subject to the mandatory reporting requirement if he or she ever reported the defendant to the authorities. In short, defendants, including Lynch, have many other means by which to cast doubt on a complainant's allegations and the State's case, thereby affording defendants the opportunity to present a meaningful defense.[31]

_____

[31] It is true that there are occasions when a defendant is wrongfully accused of committing a crime, including a sexual assault, and we realize that this is an emotionally appealing argument that favors the dissent's position. This kind of emotional appeal is heightened when members of this court use inflammatory rhetoric.

Regardless, we expect the criminal justice system to function as it is supposed to by weeding out occasions of false accusations. This is why we have an abundance of constitutional safeguards, such as the presumption of innocence, the right to confront and cross examine witnesses, and the Brady requirement. We have never before allowed the hypothetical idea that someone might be wrongfully accused to obliterate our rules of evidence (for example, hearsay) or our other privileges (for example, the lawyer-client privilege). See Kyle, 533 A.2d at 131 n.15 ("We note parenthetically that permitting in camera review of information protected by the absolute privilege between psychologist and client could possibly render other absolute
(continued)

55

privileges subject to the same limitation."). Simply put, we do not toss out our constitution, our rules, or our statutes solely because a defendant might be wrongly accused; rather, we rely on our criminal justice system and its adversarial process to remove erroneous cases, including erroneous sexual assault cases.

In cases like this one, neither the prosecutor nor the defendant has access to a complainant's privileged mental health treatment records. Accordingly, "[T]he privilege does not unfairly place the defense in a disadvantageous position; like the defense, the prosecution does not have access to the [privileged] file and, thus, cannot use the information to make its case." Kyle, 533 A.2d at 130; see State v. Maday, 179 Wis. 2d 346, 370-71, 507 N.W.2d 365 (Ct. App. 1993) ("A defendant who is prevented from presenting testimony from an examining expert when the state is able to present such testimony is deprived of a level playing field. '[A] State may not legitimately assert an interest in maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict obtained.'" (emphasis added) (alteration in original) (quoting Ake v. Oklahoma, 470 U.S. 68, 79) (1985))). Indeed, if the prosecution had access, it may need to disclose the records pursuant to Brady.

Brady is the reason Lynch already has access to some of the complainant's mental health treatment records. Prior to the complainant's father's trial, the complainant waived her privilege, which allowed the State to obtain certain mental health treatment records to prosecute her father. In the present case, the State turned over all of the mental health treatment records it had in its possession from when it prosecuted the complainant's father.

Let us be clear: in this case, we do nothing more than decline to create a constitutional right. We leave the question of whether a Shiffra/Green-like exception to the privilege statute is right for Wisconsin to the Legislature, which may, if so inclined, create an exception to the statute it has amended numerous times. Similarly, we leave the question of whether there is a constitutional right to access privileged information to the Supreme Court of the United States, which may, if so inclined, declare that a constitutional right to this type of information exists.

56

## III. CONCLUSION

¶73 To briefly summarize, we conclude that Lynch has no right to access privileged information via a motion for in camera review. Simply put, no constitutional provision affords him such a right. Moreover, even if Lynch had a right, his right would not automatically trump the privilege statute. Rather, his right would need to be balanced against the privilege statute. The Supreme Court of the United State's balancing test for presentation of evidence cases instructs us to consider whether the statute at hand is arbitrary or disproportionate to the purpose it is designed to serve. Here, the privilege statute is neither arbitrary nor disproportionate as it protects the free flow of open and honest communication between a patient and his or her physician. For these reasons, we would overrule Shiffra/Green and its progeny.

*By the Court.*—As a result of a divided court, the law remains as the court of appeals has articulated it.

¶74 PATIENCE DRAKE ROGGENSACK, C.J. *(concurring)*. The writing of Justice Shirley S. Abrahamson and Justice Ann Walsh Bradley herein causes concern because it diminishes the significant and sensitive issues for which review was granted; attempts to demean the writings of other justices rather than addressing legal reasoning they employ; and may evidence a pattern of joint writing that is bottomed in a desire to injure rather than to inform.

¶75 In this review, the court is faced with deciding competing legal issues: Lynch's alleged constitutional right to obtain the complainant's mental health treatment records to defend against charges of sexual assault; the complainant's privilege to withhold confidential mental health treatment records; precedent that would bar the complainant from testifying against Lynch if she does not waive the privilege she holds in regard to her mental health treatment records; and whether that precedent should be followed or modified. Justice David Prosser, Justice Annette Ziegler and Justice Michael Gableman have addressed these complex issues in various ways.

¶76 Justice Abrahamson and Justice A.W. Bradley characterize their writings as "the Twilight Zone" and "the court's imaginative zone." This defamatory labeling of colleagues' writings does not address the legal issues the parties asked us to review. However, it is the type of comment that the press will seize upon and report over and over again. Justice Abrahamson and Justice A.W. Bradley know what the press

1

will do. They even cite to the 1959 television program to aid the press in reporting their comments.

¶77 More importantly however, Justice Abrahamson's and Justice A.W. Bradley's defamatory labeling of colleagues' writings demonstrates a lack of respect for the very serious constitutional and sensitive personal issues presented by the parties who sought our review: a woman who claims repeated sexual assault at the hands of Lynch and Lynch's claim that he cannot adequately defend against her allegations without her mental health treatment records.

¶78 None of the issues before us has anything to do with the Twilight Zone or any other zone. Rather, they are significant and complex issues that the court has repeatedly struggled to address. See State v. Johnson, 2013 WI 59, 348 Wis. 2d 450, 832 N.W.2d 609 (per curiam); State v. Johnson, 2014 WI 16, 353 Wis. 2d 119, 846 N.W.2d 1 (per curiam) (opinion on reconsideration).

¶79 And finally, Justice Abrahamson's and Justice A. W. Bradley's combined writing herein may evince a pattern, wherein they combine to mount personal attacks on colleagues, rather than attacking reasoning other justices employ when deciding issues presented to the court for review. See St. Croix Cty. v. Michael D., 2016 WI 35, ¶53, 368 Wis. 2d 170, __ N.W.2d __ (Roggensack, C.J., concurring). Because transparency is helpful to the reader, I write separately and also join the lead opinion.

¶80 SHIRLEY S. ABRAHAMSON & ANN WALSH BRADLEY, JJ. *(concurring in part, dissenting in part).* The petitioner, State of Wisconsin, seeks review of a court of appeals' decision that affirmed the circuit court's determinations: (1) that the defendant made a sufficient showing entitling him to an in camera review of the complainant's privileged mental health treatment records; and (2) that the exclusive remedy for refusal to disclose those records is witness preclusion.

¶81 We would affirm that part of the court of appeals' decision that concluded, adhering to State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993), and State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298, that the defendant made a sufficient showing entitling him to an in camera review of the complainant's privileged mental health records.

¶82 However, we would reverse that part of the court of appeals' decision that concluded that exclusion of the complainant's testimony is the only available remedy when the complainant refuses to disclose the requested privileged mental health treatment records.

¶83 In discussing these issues, we focus on the "lead opinion" of Justice Michael J. Gableman (joined by two other justices) even though it does not represent the views of a majority of the justices. Indeed, Justice Gableman's opinion disagrees with the mandate (the result) stated in his opinion. The mandate affirms the court of appeals, and a majority of the court would affirm, at least in part, the decision of the court

1

of appeals. Contrary to the mandate, Justice Gableman's analysis and conclusion would reverse the decision of the court of appeals.

¶84 The implications of mislabeling Justice Gableman's three justice opinion as a "lead opinion" will be discussed further below.

¶85 For the reasons set forth, we concur in part, dissent in part, and write separately in an effort to explain what the court does (and does not do) in this case.

I

¶86 In this case we are asked to consider whether a defendant upon a sufficient showing can obtain disclosure of a witness's mental health records when it is necessary for his or her defense via a motion for in camera review. This is not a new question unaddressed by Wisconsin precedent.

¶87 In State v. Shiffra, 175 Wis. 2d 600, 605, 499 N.W.2d 719 (Ct. App. 1993), the court of appeals determined that a defendant is entitled to an in camera review of mental health treatment records once the defendant makes a preliminary showing that the sought-after evidence is material to his or her defense. This court adopted Shiffra, with some modification, in State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298.[1]

---

[1] Green clarified that for an in camera review the defendant must make a preliminary showing that there is "a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative to other evidence available to the defendant." State v. Green, 2002 WI 68, ¶34, 253 Wis. 2d 356, 646 N.W.2d 298.

2

¶88 Wisconsin courts have relied on Shiffra for decades. See, e.g., Johnson v. Rogers Mem'l Hosp., Inc., 2005 WI 114, ¶¶72-73, 283 Wis. 2d 384, 700 N.W.2d 27; State v. Allen, 2004 WI 106, ¶31, 274 Wis. 2d 568, 682 N.W.2d 433; State v. Solberg, 211 Wis. 2d 372, 386-87, 564 N.W.2d 775 (1997). Given that reliance, extra weight must be accorded to the principle of stare decisis (stand by things decided).

¶89 Yet, Justice Gableman's opinion would overrule this long-standing precedent.[2] The lengthy discussion of why Justice Gableman's opinion would overrule Shiffra relegates Wisconsin's jurisprudence on stare decisis to a footnote. This doctrine is a necessary part of any analysis that attempts to justify overruling a case that has been relied on for decades and cited approximately 90 times by state courts (including Wisconsin courts).

¶90 Further, the premise of Justice Gableman's opinion that there is no constitutional right to access information in criminal cases is a flawed overgeneralization. Justice Gableman's op., ¶¶47, 55. It serves as a spring board enabling Justice Gableman's opinion to reach an erroneous conclusion that there is no constitutional basis for allowing a defendant access to a complainant's mental health records.

¶91 Finally, Justice Gableman's opinion ignores a canon of statutory construction, requiring statutes addressing the same

---

[2] Only three justices voted to overrule the Shiffra/Green procedure. Because we are unable to reach a consensus, the decision of the court of appeals stands.

3

subject to be interpreted such that both statutes are operative. Rather than reading the statutes to give legal effect to both, Justice Gableman's opinion's analysis considers only one statute, allowing it to reach its conclusion that the Shiffra/Green procedure "cannot be grounded in any other legal basis." Justice Gableman's op., ¶8.

¶92 Contrary to Justice Gableman's opinion, neither we nor a majority of the court would discard our long-standing precedent so easily. The Shiffra/Green procedure is a reasonable answer to the difficult issue of how to balance multiple competing interests. Although we concur believing that Shiffra should be upheld, we yet again caution that Shiffra's remedies are not limited to witness preclusion. Accordingly, we respectfully dissent in part.

II

¶93 Absent from Justice Gableman's opinion is an analysis of Wisconsin's jurisprudence on stare decisis. Instead, its discussion of stare decisis focuses on quotations from the United States Supreme Court. Justice Gableman's op., ¶39 n.18. However, this court has provided more detailed guidance on how stare decisis applies in our state. It has repeatedly explained that the principle requires "special justification" to overrule past decisions. See, e.g., State v. Luedtke, 2015 WI 42, ¶40, 362 Wis. 2d 1, 863 N.W.2d 592; State v. Young, 2006 WI 98, ¶51, 294 Wis. 2d 1, 717 N.W.2d 729; Bartholomew v. Wis. Patients Comp. Fund, 2006 WI 91, ¶32, 293 Wis. 2d 38, 717 N.W.2d 216.

¶94 We have indicated that the reasons for departing from stare decisis typically include: "changes or developments in the law that undermine the rationale behind a decision"; "the need to make a decision correspond to newly ascertained facts"; "a showing that a decision has become detrimental to coherence and consistency in the law"; "a showing that a decision is unsound in principle"; and "a showing that a decision is unworkable in practice." Young, 294 Wis. 2d 1, ¶51 n.16 (citing Johnson Controls, Inc. v. Emp'rs. Ins., 2003 WI 108, ¶¶98-99, 264 Wis. 2d 60, 665 N.W.2d 257).

¶95 The body of Justice Gableman's opinion does not point to any of these reasons for departing from stare decisis, rather it explains that it would overrule Shiffra because Shiffra relied on Pennsylvania v. Ritchie, 480 U.S. 39 (1987), a case involving distinguishable circumstances. Justice Gableman's opinion asserts that Ritchie is an "untenable foundation" for Shiffra's procedure and "never should have been stretched to cover privileged records held by agencies far removed from investigative and prosecutorial functions." Justice Gableman's op., ¶¶36, 39. In a footnote, it adds that Shiffra is unsound in principle. Id., ¶39 n.19.

¶96 We cannot agree that the Shiffra court's decision to extend United States Supreme Court precedent to a somewhat analogous situation is "untenable" or "unsound." As detailed in Justice Ziegler's "dissent" and discussed in Justice Prosser's "dissent," Ritchie does not foreclose its application to a

5

broader set of circumstances. Justice Ziegler's "dissent," ¶¶28-33; Justice Prosser's "dissent," ¶¶7-8.

¶97 This point is underscored by the fact that Shiffra's approach was not unique. Several courts have extended Ritchie's holding to mental health records kept by private entities. See, e.g., State v. Kelly, 545 A.2d 1048, 1056 (Conn. 1988); Burns v. State, 968 A.2d 1012, 1024 (Del. 2009); People v. Bean, 560 N.E.2d 258, 273 (Ill. 1990); Commonwealth v. Barroso, 122 S.W.3d 554, 564 (Ky. 2003); Cox v. State, 849 So. 2d 1257, ¶53 (Miss. 2003); State v. Cressey, 628 A.2d 696, 703-04 (N.H. 1993); State v. Rehkop, 908 A.2d 488, 495-96 (Vt. 2006); Gale v. State, 792 P.2d 570, 581 (Wyo. 1990).

¶98 Given that Wisconsin courts have relied on Shiffra for decades, extra weight must be accorded to the principle of stare decisis. The factual distinctions between Ritchie and Shiffra fall short of its special justification requirement.

¶99 Perhaps Justice Gableman's opinion omits an analysis of Wisconsin's jurisprudence on stare decisis because it would inexorably lead to a different conclusion. In essence, Justice Gableman's opinion is anchored to the belief that Shiffra was wrongly decided.

¶100 Stare decisis has been heralded as a cornerstone of this state's jurisprudence since our earliest days of statehood. In 1859 the Wisconsin Supreme Court declared: "Stare decisis is the motto of courts of justice." Ableman v. Booth, 11 Wis. (*498) 517, (*522) 541 (1859).

6

¶101 The doctrine requires fidelity to the rule of law. Because Shiffra is well-established precedent, the question is not who has the better argument today but "whether today's ["lead opinion"] has come forward with the type of extraordinary showing that this court has historically demanded before overruling one of its precedents." Payne v. Tennessee, 501 U.S. 808, 848 (1991) (Marshall, J., dissenting). The answer is clear: it has not.

¶102 Nothing of legal consequence has changed since Shiffra. The only change has been in the composition of the court.

## III

¶103 Justice Gableman's opinion also errs by making overgeneralized statements about a defendant's right to access information in order to claim that there is no constitutional basis for allowing a defendant access to mental health treatment records. It broadly provides that there is no constitutional right to access information in criminal cases. Justice Gableman's op., ¶¶47, 55. Further, it claims that "a defendant is entitled to access information only to the extent outlined in Wis. Stat. § 971.23, our criminal discovery statute." Justice Gableman's op., ¶47; see also Justice Gableman's op., ¶54 ("Discovery is purely statutory").

¶104 These statements overlook past precedent discussing criminal defendants' due process rights. In State v. Maday, the court held that "pretrial discovery is a fundamental due process right." Maday, 179 Wis. 2d 346, 354, 507 N.W.2d 365 (Ct. App.

7

1993). That case considered whether a defendant could require a victim to undergo a pretrial psychological evaluation when the state gives notice that it intends to introduce evidence generated by an exam of the victim by its own experts.[3] The court answered this question in the affirmative. It explained that due process accords a defendant the opportunity to give relevant evidence at trial and a defendant could not do so without having the opportunity to first discover it.[4]

¶105 This court quoted Maday with approval in State v. Schaefer, 2008 WI 25, 308 Wis. 2d 279, 746 N.W.2d 457. Schaefer agreed that "[p]roviding a defendant with meaningful pretrial discovery underwrites the interest of the state in guaranteeing that the quest for the truth will happen during a fair trial."[5]

---

[3] State v. Maday, 179 Wis. 2d 346, 349, 507 N.W.2d 365 (Ct. App. 1993).

[4] Maday, 179 Wis. 2d at 357.

[5] State v. Schaefer, 2008 WI 25, ¶23, 308 Wis. 2d 279, 746 N.W.2d 457 (quoting Maday, 179 Wis. 2d at 354-55) (emphasis omitted).

Curiously, Justice Gableman's opinion cites Schaefer as a basis for its statement that "a defendant is entitled to access information only to the extent outlined in Wis. Stat. § 971.23." Justice Gableman's op., ¶47. However, the comments in Schaefer referenced by Justice Gableman's opinion were made in the context of discussing whether there is a right to discovery prior to a preliminary examination. Because the constitutional right to compulsory process applies to trials and not preliminary examinations, it determined that Wis. Stat. § 971.23(1) (requiring the prosecution to provide discovery materials within a reasonable time before trial) and Wis. Stat. § 971.31(5)(b) (barring discovery motions at preliminary examinations and prior to the filing of an information) governed.

¶106 Similar sentiments were expressed in State v. Migliorino, 170 Wis. 2d 576, N.W.2d 678 (Ct. App. 1992). In that case the defendant had been charged with trespass to a medical facility, which required a showing that the entry "tend[ed] to create or provoke a breach of the peace."[6] The defendant sought the identities of the patients present when she entered the facility in order to dispute that element of the charge. Thus, the issue before the court was whether a defendant had the right to discover the identity of the patients.

¶107 The court observed that the compulsory process right, is "in plain terms the right to present a defense."[7] That right, in turn, "is fundamental to due process."[8] Accordingly, it explained that "[t]he concomitant issue of access to the identity of witnesses, as to whom the compulsory-process right would apply, is generally analyzed against the framework of 'fundamental fairness' guaranteed by due process."[9] Observing that "[i]t would be a bizarre rule indeed that gave defendants a compulsory-process right to call witnesses but which also withheld from them the ability to discover the identity of those witnesses," the Migliorino court determined that at the very

---

[6] Migliorino, 170 Wis. 2d at 592.

[7] Migliorino, 170 Wis. 2d at 586 (quoting Washington v. Texas, 388 U.S. 14, 19 (1967)).

[8] Migliorino, 170 Wis. 2d at 586.

[9] Migliorino, 170 Wis. 2d at 586.

least, the defendant was entitled to an in camera hearing to determine whether any of the patients present had knowledge of the "circumstances" of the defendant's entry.[10]

¶108 To be clear, this court has observed the "general rule" that there is no "broad right of discovery" in criminal cases. State v. Miller, 35 Wis. 2d 454, 474, 151 N.W.2d 157 (1967) (emphasis added). However, a general rule against broad discovery does not preclude the possibility of scenarios where defendants are entitled to information. As Maday and Migliorino demonstrate, due process can require limited access to information in certain circumstances. Accordingly, Justice Gableman's opinion's premise that there is no constitutional right to access information in criminal cases, is a flawed overgeneralization. Justice Gableman's op., ¶¶47, 55.

IV

¶109 In addition to making overgeneralizations which overlook Wisconsin precedent, Justice Gableman's opinion's analysis ignores a canon of statutory construction. It is well-established that statutes addressing the same subject should be read in pari materia, such that both statutes are operative. Kolupar v. Wilde Pontiac Cadillac, Inc., 2007 WI 98, ¶28, 303 Wis. 2d 258, 735 N.W.2d 93.

¶110 Yet, although Justice Gableman's opinion recognizes that there are two related statutes at issue in this case——Wis. Stat. § 146.82, which makes patient health care records

---

[10] Migliorino, 170 Wis. 2d at 586, 595.

confidential, and Wis. Stat. § 905.04, which accords a patient the privilege of refusing to disclose such confidential information——its analysis considers only the statute creating the privilege. Justice Gableman's op., ¶¶19, 56-63.

¶111 Our precedent is clear that these two statutes must be interpreted together. We have explained that the principle of in pari materia applies because together the statutes "represent a collective statement as to the reach and limits of the confidentiality and privilege which attach to [health care] records or communications." State v. Denis L.R., 2005 WI 110, ¶57 n.21, 283 Wis. 2d 358, 699 N.W.2d 154 (quoting State v. Allen, 200 Wis. 2d 301, 309, 546 N.W.2d 517 (Ct. App. 1996)); see also Johnson v. Rogers Mem'l Hosp., 283 Wis. 2d 384, ¶36; Justice Prosser's "dissent," ¶12.

¶112 Although Wis. Stat. § 905.04 does not include an exception to the privilege permitting access to mental health records when they are necessary for a defense, such an exception can be found in the confidentiality statute. Wisconsin Stat. § 146.82(2)(a)4. provides that patient health care records shall be released "[u]nder a lawful order of a court of record." Nowhere does Justice Gableman's opinion discuss this language or how it should be interpreted alongside the privilege statute so that it still has meaning. Without such an analysis, Justice Gableman's opinion is incomplete.

V

¶113 Contrary to Justice Gableman's opinion, we would not overrule Shiffra. There are strong interests implicated when a

11

defendant seeks a witness's mental health treatment records. For defendants, it is the interest in being able to present a complete defense. See Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'")); State v. Behnke, 203 Wis. 2d 43, 56, 553 N.W.2d 265 (Ct. App. 1996) ("[T]he Due Process Clause guarantees the defendant a right to a trial based on truth seeking which can only be accomplished by allowing him or her to present a complete defense.").

¶114 At the same time, patients have an interest in keeping their mental health treatment records private. Due to the sensitive nature of the problems for which patients seek mental health treatment, "disclosure of confidential communications made during counseling session may cause embarrassment or disgrace." Jaffee v. Redmond, 518 U.S. 1, 10 (1996). Accordingly, the physician-patient privilege in Wis. Stat. § 905.04 was created "to encourage patients to freely and candidly discuss medical concerns with their physicians by ensuring that those concerns will not unnecessarily be disclosed to a third person." Steinberg v. Jensen, 194 Wis. 2d 439, 459, 534 N.W.2d 361 (1995).

¶115 The Shiffra procedure takes both of these interests into account and prescribes a reasonable balance. Solberg, 211

12

Wis. 2d at 387 ("Such a procedure strikes an appropriate balance between the defendant's due process right to be given a meaningful opportunity to present a complete defense and the policy interests underlying the Wis. Stat. § 904.05(2) privilege.").

¶116 It is consistent with the approach taken by a majority of state courts. [11] They "have held that a criminal defendant, upon a preliminary showing that the records likely contain exculpatory evidence, is entitled to some form of pretrial discovery of a prosecution witness's mental health treatment records that would otherwise be subject to an 'absolute' privilege." Barroso, 122 S.W.3d at 561. In camera judicial review of a victim's privileged records "currently represents the most common method of balancing statutory privileges against the defendant's trial rights." State v. Pratt, 669 A.2d 562,

---

[11] See e.g., D.P. v. State, 850 So. 2d 370, 373 (Ala. Crim. App. 2002); State v. Slimskey, 779 A.2d 723, 732 (Conn. 2001); Burns v. State, 968 A.2d 1012, 1024 (Del. 2009); Lucas v. State, 555 S.E.2d 440, 446 (Ga. 2001); People v. Bean, 560 N.E.2d 258, 273 (Ill. 1990); State v. Thompson, 836 N.W.2d 470, 486 (Iowa 2013); Commonwealth v. Barroso, 122 S.W.3d 554, 564 (Ky. 2003); State v. Johnson, 102 A.3d 295, 297 (Md. 2014); State v. Hummel, 483 N.W.2d 68, 72 (Minn. 1992); Cox v. State, 849 So. 2d 1257, 1272 (Miss. 2003); State v. Duffy, 6 P.3d 453, 458 (Mont. 2000); State v. Gagne, 612 A.2d 899, 901 (N.H. 1992); Kinsella v. Kinsella, 696 A.2d 556, 570 (N.J. 1997); State v. Gonzales, 912 P.2d 297, 302 (N.M. Ct. App. 1996); People v. Viera, 133 A.D.3d 622, 623 (N.Y. App. Div. 2015); State v. Burnham, 58 A.3d 889, 898 (R.I. 2013); State v. Middlebrooks, 840 S.W.2d 317, 333 (Tenn. 1992), superseded on other grounds by Tenn. Code Ann. § 39-13-392; State v. Cramer, 44 P.3d 690, 695-96 (Utah 2002); State v. Barbera, 872 A.2d 309, 313 (Vt. 2005); Gale v. State, 792 P.2d 570, 581 (Wyo. 1990).

571 (Conn. 1995). We see no reason to depart from our precedent and end this practice in Wisconsin.

¶117 Because we would not overrule the Shiffra/Green procedure, we turn to the question left unaddressed by Justice Gableman's opinion: is witness preclusion the only remedy available to the circuit court when a complainant refuses to waive the physician-patient privilege?

¶118 We have addressed this issue before. When this court granted the motion for reconsideration in State v. Johnson, we wrote separately to explain that witness preclusion was not the only remedy intended by the Shiffra court. 2014 WI 16, ¶19, 353 Wis. 2d 119, 846 N.W.2d 1 (Ann Walsh Bradley, J., concurring in part, dissenting in part, joined by Abrahamson, C.J.) ("The court in Shiffra expressly contemplated that a variety of sanctions may be appropriate depending on the circumstances.").

¶119 In Shiffra, the court determined that it was not a misuse of the circuit court's discretion to suppress the victim's testimony as a sanction for her refusal to release the records. 175 Wis. 2d at 612. Nowhere did it limit the remedies available to witness preclusion. Rather, its language made clear that it was discussing the facts of the case before it:

> The only issue remaining is whether the trial court misused its discretion when it suppressed Pamela's testimony as a sanction for her refusal to release the records. In this situation, no other sanction would be appropriate. The court did not have the authority to hold Pamela in contempt because she is not obligated to disclose her psychiatric records. An adjournment in this case would be of no benefit because the sought-after evidence would still be unavailable. Under the circumstances, the only method of protecting Shiffra's

14

right to a fair trial was to suppress Pamela's testimony if she refused to disclose her records.'

Id. (emphasis added).

¶120 The author of Shiffra later clarified that the case did not require suppression. State v. Johnson, No. 2011AP2864-CRAC, unpublished slip op., ¶¶23-28 (Wis. Ct. App. Apr. 18, 2012) (Brown, C.J., dissenting). He proposed an alternative remedy, whereby "if an alleged victim refuses to release medical or counseling records to the court for in camera inspection, the court may compel release anyway, pursuant to Wis. Stat.§ 146.82(2)(a)4." Id., ¶24. Acknowledging that Wis. Stat. § 146.82 generally will not trump the physician-patient privilege, he explained that where the privilege is trumped by constitutional concerns, a court may utilize Wis. Stat. § 146.82(2)(a)(4) in order to conduct an in camera review. Id., ¶25.

¶121 We would adopt this approach. It harmonizes the two statutes addressing mental health treatment records and accounts for defendants' right to present a complete defense. Further, it alleviates the state's concern that the Shiffra procedure allows witnesses to thwart prosecution. By giving the court the power to review some mental health treatment records in camera when a defendant has established a constitutional right to that review, Judge Brown's remedy leaves the balancing of the competing interests in the hands of the court.

¶122 As Judge Brown observed, "[t]he courts are especially equipped for this task. Indeed, it is what judges do." Johnson, No. 2011AP2864-CRAC, ¶27. We agree.

15

VI

¶123 In closing, we turn to the implications of mislabeling Justice Gableman's three-justice opinion as a "lead opinion." Rather than sow the seeds of confusion by issuing our opinions seriatim with Justice Gableman's opinion occupying the "lead" role, we should hew to our two-year-old precedent in Johnson, 353 Wis. 2d 119, ¶1 (on reconsideration).  In Johnson, we addressed almost identical factual and legal issues, and issued a per curiam opinion stating that because the court was deadlocked, "the court of appeals decision must be affirmed."[12]

¶124 Reading Justice Gableman's writing, designated as the "lead" opinion, and reading Justice Prosser's and Justice Ziegler's writings, self-designated (and so dubbed by Justice Gableman) as "dissenting" opinions makes us feel like we've stepped into "the Twilight Zone."[13]  As Justices Prosser and Ziegler explain, they are dissenting because they disagree with Justice Gableman's writing; they are not dissenting from the court's bottom line, which affirms the decision of the court of appeals.

¶125 All appearances to the contrary, the mandate (the result) in this case is "the decision of the court of appeals is affirmed."  Justice Gableman's opinion, referred to as the "lead

---

[12] State v. Johnson, 2014 WI 16, ¶1, 353 Wis. 2d 119, 846 N.W.2d 1 (on reconsideration).

[13] CBS, The Twilight Zone (1959).

opinion," disagrees with this result and is in reality a dissent.[14]

¶126 Three separate writings (Justice Ziegler's, Justice Prosser's, and ours) concur (at least in part) in the result and with the decision of the court of appeals. But for some unstated reason, both Justice Prosser's and Justice Ziegler's writings are labeled (and referred to in the "lead opinion") as "dissents."[15]

¶127 By failing to acknowledge the real positions of the justices, we are, in the words of Rod Serling, the creator of The Twilight Zone, "traveling through another dimension . . . into a . . . land whose [only] boundaries are that of imagination."

¶128 In this zone of the court's imagination, Justice Gableman's opinion (which represents the views of two other justices, Patience Drake Roggensack and Rebecca G. Bradley) is the "lead opinion," even though these three justices disagree with the mandate, which leaves "the law . . . as the court of appeals has articulated it" intact.

¶129 The court of appeals in this case followed Shiffra and Green.[16] Justice Gableman's "lead opinion," however, would overturn Shiffra and Green.

---

[14] Compare Justice Gableman's opinion, n.1.

[15] See Justice Gableman's opinion, ¶¶16 n.15, 39 n.17 & 18, 72 n.31.

[16] See State v. Lynch, 2015 WI App 2, ¶¶8, 44-45, 359 Wis. 2d 482, 859 N.W.2d 125.

¶130 Normally, we have a word for opinions that do not garner the votes of a majority of the participating justices and disagree with the mandate of the court: We call them "dissents." For some unstated reason, Justice Gableman does not label his writing either a dissent or a concurrence, thus masking its true nature.

¶131 Likewise, in the court's imaginative zone, the opinions of Justices Prosser and Ziegler are "dissents." Yet they agree with the outcome of this case and would affirm the decision of the court of appeals, which followed Shiffra and Green. We would also affirm the part of the decision of the court of appeals that followed Shiffra and Green as well, although we would reverse the part of the decision of the court of appeals that held that witness preclusion is the sole remedy available under Shiffra and Green.[17]

¶132 Outside this imaginative zone, we have a word for opinions that do not garner the votes of a majority but agree with the mandate of the court: We call them "concurrences."

¶133 For some unstated reason, this label is not applied to Justice Prosser's and Justice Ziegler's writings.

¶134 As Justice Ziegler writes, acknowledging the absurdity of labelling her writing as a "dissent" when she agrees with the result of this case: "Hence, although I write in dissent, I dissent from the lead opinion; I agree with the functional outcome of this case."[18]

---

[17] See supra ¶42.

[18] Justice Ziegler's "dissent," ¶47 n.14.

18

¶135 The "functional outcome of this case" is that we affirm the court of appeals. In fact, that is the outcome our precedent requires when, as happened just two years ago in an almost identical factual situation raising the same legal issues, the court deadlocked: "the court of appeals decision must be affirmed." See Johnson, 353 Wis. 2d 119, ¶1.

¶136 In Johnson, the court (sitting with just five members) initially issued a per curiam opinion holding that, under varying rationales, (1) a circuit court may not require a victim to produce privately held, privileged mental health records for in camera review; and (2) the victim may testify even if he or she does not produce privately held, privileged mental health records for in camera review. State v. Johnson, 2013 WI 59, ¶¶5-7, 348 Wis. 2d 450, 832 N.W.2d 609.

¶137 Subsequently, however, as we stated previously, the court granted reconsideration and modified the prior per curiam, asserting that "[v]ery simply stated, the court of appeals is affirmed because no three justices[, a majority on a five member court,] conclude either (1) that under Shiffra, the victim must produce the records if she is to testify, or (2) that under Green, the victim need not produce the records in order to testify." Johnson, 353 Wis. 2d 119, ¶3 (on reconsideration). "As a result, since a majority of the court has not reached consensus under precedent so as to decide the issue presented and the court is deadlocked, the decision of the court of appeals must be affirmed." Johnson, 353 Wis. 2d 119, ¶13 (on reconsideration).

¶138 This case raises the same issues as Johnson, only this time with a seven-member court. Following Johnson as precedent, we should issue a per curiam opinion affirming the court of appeals. Any justice could, if the justice wished, write separately. The justices' separate writings would appear as concurrences or dissents in order of seniority, as is our usual practice.

¶139 But rather than hew to our precedent in Johnson, the court sows the seeds of confusion and issues our opinions seriatim with Justice Gableman's opinion (a dissenting opinion issued without any label) being called the "lead opinion."

¶140 The proliferation of separate writings (as in this case) and "lead opinions" is emblematic of the court's work this "term" (September 2015 to June 2016).

¶141 Although we have not done a statistical analysis, our perception is that few of the court's decisions this term have been unanimous without any separate writings,[19] and several, including this case, have begun with "lead opinions." See, e.g., Singh v. Kemper, 2016 WI 67, ___ Wis. 2d ___, ___ N.W.2d ___ (lead op. of Ann Walsh Bradley, J., joined by Abrahamson, J.); Lands' End, Inc. v. City of Dodgeville, 2016 WI 64, ___ Wis. 2d ___, ____ N.W.2d ____ (lead op. of Abrahamson, J., joined by Ann Walsh Bradley, J., and Gableman, J.); Coyne v. Walker, 2016 WI 38, 368 Wis. 2d 444, 879 N.W.2d 520 (lead op. of

---

[19] See, e.g., State v. Tourville, 2016 WI 17, 367 Wis. 2d 285, 876 N.W.2d 735 (unanimously affirming the court of appeals).

20

Gableman, J. with Abrahamson, J., Ann Walsh Bradley, J., and Prosser, J., each concurring separately); State v. Smith, 2016 WI 23, 367 Wis. 2d 483, 878 N.W.2d 135 (lead op. of Roggensack, C.J., joined by Prosser, J., and Gableman, J.); United Food & Comm. Workers Union, Local 1473 v. Hormel Foods Corp., 2016 WI 13, 367 Wis. 2d 131, 876 N.W.2d 99 (lead op. of Abrahamson, J., joined by Ann Walsh Bradley, J.); Hoffer Props., LLC v. DOT, 2016 WI 5, 366 Wis. 2d 372, 874 N.W.2d 533 (lead op. of Gableman, J., joined by Roggensack, C.J., and Ziegler, J.).

¶142 The phrase "lead opinion" is not, as far as we are aware, defined in our Internal Operating Procedures or elsewhere in the case law. Our Internal Operating Procedures (IOPs) refer to "lead opinions," but only in stating that if, during the process of circulating and revising opinions, "the opinion originally circulated as the majority opinion does not garner the vote of a majority of the court, it shall be referred to in separate writings as the 'lead opinion.'" Wis. S. Ct. IOP II.G.4.[20]

¶143 Prior to this case, we would have said that a lead opinion is one that states (and agrees with) the mandate of a majority of the justices, but represents the reasoning of less than a majority of the participating justices. So, for example, in a case with six justices participating, if three justices join one opinion affirming the decision of the court of appeals, two justices join a different opinion affirming the decision of

---

[20] Our internal operating procedures are contained in volume 6 of the Wisconsin Statutes.

21

the court of appeals, and one justice dissents, there is a single mandate——the decision of the court of appeals is affirmed——but no majority opinion. See Hoffer, 366 Wis. 2d 372. Rather, one of the opinions affirming the decision of the court of appeals will be the lead opinion.

¶144 This case, however, unnecessarily complicates our understanding of what is a "lead opinion." Now, an opinion that disagrees with the mandate and argues for an outcome with which a majority of the court disagrees can be designated a "lead opinion."

¶145 The absence of an agreed-upon definition for "lead opinion" has the potential to cause confusion among the bench, the bar, and the public. Also, the precedential effect (or lack thereof) of a "lead opinion" is uncertain. Are lead opinions in this court comparable to plurality opinions in the United States Supreme Court?[21] Apparently, the court of appeals considers a plurality decision of this court persuasive but does not always consider it binding. See, e.g., State v. King, 205 Wis. 2d 81,

---

[21] See Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'") (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

For discussions by this court of the precedential effect of plurality opinions in the United States Supreme Court, see, for example, State v. Griep, 2015 WI 40, ¶36, 361 Wis. 2d 657, 863 N.W.2d 567; State v. Deadwiller, 2013 WI 75, ¶30, 350 Wis. 2d 138, 834 N.W.2d 362.

22

88-89, 555 N.W.2d 189 (Ct. App. 1996) (citing State v. Dowe, 120 Wis. 2d 192, 194, 352 N.W.2d 660 (1984)).

¶146 We would avoid the unnecessary confusion caused by Justice Gableman's dissenting "lead" opinion, and issue a simple per curiam opinion stating, as we did in Johnson, that "the court of appeals decision must be affirmed."[22] Each justice could attach his or her separate writing to this per curiam explaining how she or he would decide the case. This procedure would avoid the confusion inherent in conferring, for some unstated reason, "lead opinion" status on Justice Gableman's dissenting opinion.

¶147 In closing, we note another way in which this case is emblematic of the court's work during this term.

¶148 Despite one of the lightest (if not the lightest) case loads ever in modern times and the adoption (by a divided court) of a new procedure for circulating and mandating opinions on September 25, 2014 (ostensibly designed to avoid the June "crush"), around 40 percent of our decisions (including the case before us) will be completed and released in June and July.[23] This is true even though the court no longer discusses draft

---

[22] Johnson, 353 Wis. 2d 119, ¶1.

[23] All of the justices' work on opinions is completed on or before June 30. Because the number of mandates is limited each week, several opinions finished by June 30 are released in July.

opinions in conference unless a majority of justices vote to do so.[24]

¶149 In sum, failing to issue a per curiam opinion here raises the potential for significant confusion over the outcome of this case, the implication of our decision for future cases, and the definition of "lead opinion," a term that has seen increasing use of late.  These issues should be approached by the court and the justices in a descriptive, analytical, and historical manner, free from divisiveness or offensive posturing, personal attacks, and false accusations.

¶150 Engaging in or responding to such personal attacks and accusations neither sheds light on the inquiry before us nor promotes public trust and confidence in the court.

¶151 For the reasons set forth, we concur in part, dissent in part, and write separately to address institutional concerns.

---

[24] The court's procedures for circulating and mandating opinions have been written about before. See, e.g., State v. Gonzalez, 2014 WI 124, ¶¶25-40, 359 Wis. 2d 1, 856 N.W.2d 580 (Abrahamson, C.J., concurring) (setting forth the procedure in full).  Others have noted the light case load this term. See Alan Ball, Justice Abrahamson's Concerns Over the Docket – An Update, SCOWstats (Mar. 20, 2016), http://www.scowstats.com/2016/03/20/justice-abrahamsons-concerns-over-the-docket-an-update/.

¶152 DAVID T. PROSSER, J. *(dissenting)*. The principal issue on review is whether the decisions in State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993), and State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298 (2002), should be overruled. Although the lead opinion by Justice Michael J. Gableman makes a number of compelling arguments about the foundation and lineage of Shiffra and Green, as well as their effect on Wisconsin law, I am ultimately persuaded that the better course for this court is to address the concerns arising from these opinions rather than to strike them down and start over. In my view, overruling the opinions is more likely to intensify controversy than to resolve it, as overruling would seriously undermine a number of prior decisions and would invite a host of new theories to protect criminal defendants at trial.

I

¶153 Because of divisions within the court, Justice Gableman was assigned the responsibility of writing a lead opinion. Two justices[1] have joined him in the following conclusions:

> Shiffra/Green improperly relied on [Pennsylvania v. Ritchie, 480 U.S. 39 (1987),] when it invented a right to access privileged information (specifically a complainant's privileged mental health treatment records) via a motion for in camera review. We further conclude that Shiffra/Green cannot be grounded in any other legal basis, specifically any other constitutional provision.

_____

[1] Chief Justice Patience Drake Roggensack and Justice Rebecca G. Bradley.

1

Lead op., ¶8. I dissent from these conclusions, which would provide a basis for overruling Shiffra and Green and would concomitantly reverse the decision of the court of appeals.[2]

¶154 I read Justice Gableman's opinion as making the following observations about the Ritchie case:

(1) Defendant Ritchie sought materials from the "investigative files" of Children and Youth Services (CYS), "a protective service agency charged with investigating cases of suspected mistreatment and neglect." Ritchie, 480 U.S. at 43. The victim in Ritchie was referred to CYS by police.

(2) The Pennsylvania statute pertaining to CYS provided that "all reports and other information obtained in the course of a CYS investigation" were "confidential, subject to 11 specific exceptions." Id. One of these exceptions was release "pursuant to a court order." In other words, courts were specifically authorized by

---

[2] Two other justices, Shirley S. Abrahamson and Ann Walsh Bradley, would reverse the decision of the court of appeals in part for a wholly different reason. Like Justice Annette Kingsland Ziegler and the writer, Justices Abrahamson and Ann Walsh Bradley would not overrule Shiffra and Green. Justices Abrahamson and Ann Walsh Bradley's concurrence/dissent, ¶2. They would, however, reverse the decision of the court of appeals in part to permit a circuit court to compel release of the records pursuant to Wis. Stat. § 146.82(2)(a)4. when a complainant refuses to release records to the court for an in camera review. Id., ¶¶42-43. I dissent from this specific remedy proposed by the two justices. In essence, then, I vote to affirm the decision of the court of appeals with the caveat explained in ¶30 & n.6, infra, of this dissent.

2

statute to release confidential information in appropriate circumstances.

(3) The Supreme Court relied exclusively on Brady v. Maryland, 373 U.S. 83 (1963), the case that articulated a prosecution disclosure obligation, and cases that clarify Brady, to support its decision. The first sentence of the Court's due process analysis reads: "It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." Ritchie, 480 U.S. at 57 (emphasis added).

(4) The CYS was a government agency, acting on the Commonwealth's behalf, and its records were constructively in the possession of the prosecutor.

¶155 The lead opinion contrasts these factors with the facts in Shiffra:

(1) The defendant sought the complainant's psychiatric records from private health care providers. The State did not engage any of those providers for the complainant.

(2) The prosecutor did not possess any private records and was not required to provide them to the defendant under Brady or Wis. Stat. § 971.23. In fact, the Shiffra court did not cite Brady in its opinion.

(3) The complainant's refusal to release her records was grounded on a privilege statute, Wis. Stat.

3

§ 905.04(2), which included no provision for a court order.

¶156 The differences between the facts in Ritchie and the facts in Shiffra are admittedly striking. The question is whether they are constitutionally determinative. I do not believe they are.

A

¶157 It is important to understand the dynamics in Ritchie. The Supreme Court of Pennsylvania had relied on the Sixth Amendment's Confrontation Clause for its decision to give the defendant access to the entire CYS file related to the complainant. The Supreme Court of Pennsylvania did not rely on Brady at all.[3] It said:

> The purpose of [the Confrontation Clause] is to provide an accused with an effective means of

---

[3] A dissenting member of the court provided additional factual insights about the case:

> We do not deal with exculpatory material which the defendant has requested and which is in the possession of the Commonwealth. Although the Act authorizes disclosure of child protective service agency files to law enforcement officials investigating cases of child abuse, 11 P.S. § 2215(9) and (10), there is no indication that any law enforcement officials ever had access to the CWS files in question. Moreover, it is clear from the record that the prosecution did not have any information from the CWS records in its possession nor did the Commonwealth use CWS records in any way to prosecute appellee.

Commonwealth v. Ritchie, 502 A.2d 148, 157-58 (Pa. 1985) (Larsen, J., dissenting), aff'd in part, rev'd in part, 480 U.S. 39 (1987).

4

challenging the evidence against him by testing the recollection and probing the conscience of an adverse witness. . . .

. . . .

. . . "The search for truth" and the quest for "every man's evidence" so plainly the basis of the Sixth Amendment . . . are as applicable to any material as to prior statements. When materials gathered become an arrow of inculpation, the person inculpated has a fundamental constitutional right to examine the provenance of the arrow and he who aims it. Otherwise, the Sixth Amendment can be diluted to mean that one may face his accusers or the substance of the accusation, except when the accuser is shielded by legislative enactment.

Commonwealth v. Ritchie, 502 A.2d 148, 152-53 (Pa. 1985), aff'd in part, rev'd in part, 480 U.S. 39 (1987).

¶158 Four members of the Ritchie Court——Justice Powell joined by Chief Justice Rehnquist, Justice White, and Justice O'Connor——rejected reliance on the Confrontation Clause of the Sixth Amendment. A majority of the Court instead recast the facts and relied on Brady and a due process analysis. Justice Blackmun, who was part of the majority, and Justices Brennan and Marshall, in dissent, would have recognized a Sixth Amendment Confrontation Clause right to the records sought. Justices Stevens and Scalia dissented in Ritchie solely on the ground that the Court lacked jurisdiction to hear the case. They did not weigh in on the central dispute.

¶159 In sum, the Supreme Court majority in Ritchie emphasized the "investigative" function of a government agency to bring the case within Brady principles and avoid a much broader holding by the Court. The Court did not absolutely slam the door against a Compulsory Process Clause claim or even a due

process claim in a case with other facts. This puts the Ritchie decision in a different light.

B

¶160 The lead opinion draws a sharp distinction between privilege and confidentiality, emphasizing that Wis. Stat. § 905.04 is a privilege statute with no provisions authorizing a court to order release of records, in contrast to the Pennsylvania statute governing the CYS agency, which did.

¶161 There is no dispute that the Ritchie Court pointed to the fact that 11 Pa. Stat. Ann. § 2215(a)(5) (Purdon Supp. 1986) provided for release of confidential records pursuant to a court order. 480 U.S. at 43-44. However, the Court also made reference to privilege:

> CYS refused to comply with the subpoena, claiming that the records were privileged under Pennsylvania law. . . .
>
> . . . .
>
> . . . The Commonwealth . . . argues that no materiality inquiry is required, because a statute renders the contents of the file privileged. Requiring disclosure here, it is argued, would override the Commonwealth's compelling interest in confidentiality on the mere speculation that the file "might" have been useful to the defense.
>
> Although we recognize that the public interest in protecting this type of sensitive information is strong, we do not agree that this interest necessarily prevents disclosure in all circumstances.

Id. at 43, 57 (emphasis added). The Court added a footnote: "We express no opinion on whether the result in this case would have been different if the statute had protected the CYS files from

6

disclosure to anyone, including law-enforcement and judicial personnel." Id. at 57 n.14.

¶162 The Ritchie Court would have been in a tougher situation if Ritchie had sought information from a sexual assault counselor, see id. at 57 (characterizing 42 Pa. Cons. Stat. § 5945.1(b) (1982) as an "unqualified statutory privilege for communications between sexual assault counselors and victims"), or from a licensed psychologist, see 42 Pa. Cons. Stat. § 5944 (1982) ("No person who has been licensed . . . to practice psychology shall be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client."). I suspect the result would have been the same.[4]

¶163 What is important to the present case is that Wis. Stat. § 905.04——the "Physician-patient, registered nurse-patient, chiropractor-patient, psychologist-patient, social worker-patient, marriage and family therapist-patient, podiatrist-patient and professional counselor-patient privilege" statute——has 10 statutory exceptions, including the "Abused or neglected child" exception, and that the statute must be read and construed in pari materia with Wis. Stat. § 48.981 and Wis.

---

[4] As Justice Powell explained in his opinion for the Court in Schweiker v. McClure, 456 U.S. 188 (1982): "[D]ue Process is flexible and calls for such procedural protections as the particular situation demands." 456 U.S. at 200 (alteration in original) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

7

Stat. § 146.82(2) inasmuch as some fact situations will be covered by more than one statute. Lynch already has some of the Complainant's mental health records as a result of the State's prosecution of the Complainant's father. Thus, the privilege at issue in this case is not inviolate.

C

¶164 Implicit in the lead opinion's conclusion that we should overrule Shiffra/Green is complete confidence in the defendant's right to vigorously cross-examine a victim/complainant at trial.

¶165 The Court in Ritchie was not impressed with this remedy. As the Court explained, Ritchie's daughter was the main witness against him at trial: "In an attempt to rebut her testimony, defense counsel cross-examined the girl at length, questioning her on all aspects of the alleged attacks and her reasons for not reporting the incidents sooner. Except for routine evidentiary rulings, the trial judge placed no limitation on the scope of cross-examination." Ritchie, 480 U.S. at 44-45.

¶166 The fact that Ritchie was afforded ample opportunity to cross-examine his daughter did not stop the Court from ruling in Ritchie's favor. In fact, no Justice voted to block Ritchie's access to his daughter's records.

¶167 In short, the lead opinion's comparison of Ritchie and Shiffra does not persuade me that Shiffra was so off track that it must be overruled. As Justice Shirley S. Abrahamson, Justice Ann Walsh Bradley, and Justice Annette Kingsland Ziegler

8

persuasively point out in their separate writings, this court has embraced <u>Shiffra</u> and <u>Green</u>, and courts in many other states have extended <u>Ritchie</u> to cover records held by private health care providers.

II

¶168 I also disagree with the lead opinion's conclusion that "<u>Shiffra/Green</u> cannot be grounded in any other legal basis, specifically any other constitutional provision." Lead op., ¶8. If I didn't know better, I might think that the lead opinion was tying to reverse the court's declining caseload with a single provocative sentence.

¶169 There are additional bases to justify breaching a privilege or other evidentiary limitation in <u>exceptional</u> cases. Three examples immediately come to mind.

CONFIDENTIAL INFORMANT PRIVILEGE

¶170 In <u>Roviaro v. United States</u>, 353 U.S. 53 (1957), the Supreme Court discussed the government's privilege to withhold an informer's identity. The Court explained that the privilege "recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." <u>Roviaro</u>, 353 U.S. at 59. However, a "limitation on the applicability of the privilege arises from the fundamental requirements of fairness":

> Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may

9

require disclosure and, if the Government withholds the information, dismiss the action.

Id. at 60-61 (footnote omitted).

¶171 In McCray v. Illinois, 386 U.S. 300 (1967), the Court identified the basis for the Roviaro ruling: namely, "the exercise of [the Court's] power to formulate evidentiary rules for federal criminal cases." 386 U.S. at 312. As this court explained in State v. Nellessen, 2014 WI 84, 360 Wis. 2d 493, 849 N.W.2d 654, Wis. Stat. § 905.10(1) "codified this privilege for informers, which was first recognized in the seminal" Roviaro decision. 360 Wis. 2d 493, ¶15. Wisconsin's codification did not come until more than 15 years after the Roviaro decision.

## THE RAPE SHIELD LAW

¶172 Similar to other exceptions to various privileges, in State v. Pulizzano, 155 Wis. 2d 633, 456 N.W.2d 325 (1990), this court held the rape shield statute, Wis. Stat. § 972.11(2) (1985-86),[5] unconstitutional as applied, to the extent it

---

[5] The statute provided as follows:

(2)(a) In this subsection, "sexual conduct" means any conduct or behavior relating to sexual activities of the complaining witness, including but not limited to prior experience of sexual intercourse or sexual contact, use of contraceptives, living arrangement and life-style.

(b) If the defendant is accused of a crime under s. 940.225, any evidence concerning the complaining witness's prior sexual conduct or opinions of the witness's prior sexual conduct and reputation as to prior sexual conduct shall not be admitted into evidence during the course of the hearing or trial, nor shall any reference to such conduct be made in the

(continued)

10

infringed on a defendant's constitutional rights. The defendant, Pulizzano, sought to present evidence that her alleged victim "had been the victim of a prior sexual assault which involved acts similar to those alleged[ly]" performed by Pulizzano. Pulizzano, 155 Wis. 2d at 642-43. To assess Pulizzano's claim, the court described a "constitutional right to present evidence . . . grounded in the confrontation and compulsory process clauses of Article I, Section 7 of the Wisconsin Constitution and the Sixth Amendment of the United States Constitution." Id. at 645 (first citing Washington v. Texas, 388 U.S. 14, 17-19 (1967); then citing Pointer v. Texas, 380 U.S. 400, 403-06 (1965)).

¶173 Based on those constitutional protections, this court concluded that under certain circumstances "evidence of a complainant's prior sexual conduct may be so relevant and probative that the defendant's right to present it is

---

presence of the jury, except the following, subject to s. 971.31(11):

   1. Evidence of the complaining witness's past conduct with the defendant.

   2. Evidence of specific instances of sexual conduct showing the source or origin of semen, pregnancy or disease, for use in determining the degree of sexual assault or the extent of injury suffered.

   3. Evidence of prior untruthful allegations of sexual assault made by the complaining witness.

Wis. Stat. § 972.11(2) (1985-86). The statute remains substantially similar in the current codification.

11

constitutionally protected. Section 972.11, Stats., as applied, may in a given case impermissibly infringe upon a defendant's rights to confrontation and compulsory process." Id. at 647-48 (first citing Chambers v. Mississippi, 410 U.S. 284, 294-303 (1973); then citing Davis v. Alaska, 415 U.S. 308, 315-18 (1974)). If a defendant "establish[es] a constitutional right to present otherwise excluded evidence," then "the circuit court must then determine whether the State's interests in excluding the evidence are so compelling that they nonetheless overcome the defendant's right to present it." Id. at 656-57. During the balancing, "the state's interests are to be closely examined and weighed against the force of the defendant's right to present the evidence." Id. at 657.

THERAPIST-PATIENT PRIVILEGE

¶174 In Johnson v. Rogers Memorial Hospital, Inc., 2005 WI 114, 283 Wis. 2d 384, 700 N.W.2d 27, the court established an exception to the therapist-patient privilege in a third-party negligence claim against a therapist whose treatment allegedly resulted in implanting false memories of child abuse against a woman's father. The court described the exception as "a public policy exception" based on the premise that "no utility can be derived from protecting careless or inappropriate therapists and their practices." Johnson, 283 Wis. 2d 384, ¶¶63, 65.

¶175 A brief review of existing exceptions to the confidential informant privilege, rape shield law, and therapist-patient privilege demonstrates that the Shiffra/Green framework is not the only context in which courts endeavor to

12

strike a balance between defendants' constitutional rights and the policies underlying various evidentiary limitations. Professor Edward J. Imwinkelried has explained in general terms the nature of the balance that courts strike:

> In criminal cases, the [Supreme] Court has rendered exclusionary rules of evidence such as privileges qualified or conditional by developing a balancing test to determine whether the accused's constitutional right to present evidence surmounts the exclusionary rule. . . . [T]he factors in and the nature of the balancing test employed in applying the constitutional right are essentially the same as those that a judge utilizes to determine whether a litigant's need for privileged information overrides a qualified privilege. The existence of this constitutional right transforms even purportedly absolute privileges into qualified or conditional ones.

Edward J. Imwinkelried, The New Wigmore: A Treatise on Evidence § 11.3, at 1261 (2002). "[T]he vast majority of contemporary lower courts assume that the accused's constitutional right applies to evidentiary privileges and that if the excluded evidence is reliable and material enough, the right can override a privilege." Id. § 11.4.1, at 1295.

¶176 Overruling Shiffra and Green would needlessly cast doubt on Pulizzano, Johnson, and other precedent in which statutory schemes that reasonably promote privacy nevertheless give way to weightier constitutional concerns. Furthermore, if Shiffra and Green were overruled, creative counsel would soon find other sources for the authority to order release of privileged psychological and medical records, where necessary, and these sources might well prove far more problematic than

13

_Shiffra_, which has provided a constructive approach to balancing interests.

                                    III

¶177 In my view, the lead opinion is being driven by certain foundational concerns related to _Shiffra_/_Green_.

¶178 First, _Shiffra_/_Green_ appears to open the door to pretrial discovery beyond the sensible limitations in Wis. Stat. § 971.23.

¶179 Second, _Shiffra_/_Green_ breaches an important statutory privilege and other such breaches are likely to follow.

¶180 Third, _Shiffra_/_Green_ embodies two extremes. The complainant may prevent the State from prosecuting a criminal case by insisting on withholding records that the court concludes are necessary for the defendant's defense. However, the complainant must surrender her privacy in confidential communications if she releases her private psychological records as a condition for prosecuting her assailant.

¶181 These are very legitimate concerns. However, rather than overruling _Shiffra_ and _Green_, the court would be better served by focusing on and trying to address each of these concerns by further refining and improving the existing

                                    14

Shiffra/Green framework. This will necessarily include the consideration of additional remedies.[6]

¶182 For the foregoing reasons, I respectfully dissent.

---

[6] Already, the Shiffra/Green framework contemplates the circuit court placing limitations on the release of privileged mental health care records, as we indicated in Green when noting that "[w]e have confidence in . . . circuit courts [conducting an in camera review] to . . . make a proper determination as to whether disclosure of the information is necessary based on the competing interests involved in such cases." State v. Green, 2002 WI 68, ¶35, 253 Wis. 2d 356, 646 N.W.2d 298. Even "[w]hen consent is given, the judge scrutinizes the records to determine whether disclosure is warranted." 7 Daniel D. Blinka, Wisconsin Practice Series § 511.2, at 389-90 (3d ed. 2008).

In my view, the court should explore reasonable remedies between the extremes stated in ¶29, supra, so that barring testimony by the nonconsenting witness is not the sole remedy in all cases. See Blinka § 511.2, at 392. For example, Professor Blinka has suggested that

> [a]nother remedy may be to permit the witness to testify but allow the defense to cross-examine about his or her refusal to divulge records requested by the court. The defense should also be permitted to argue that the witness's nondisclosure creates a reasonable doubt based on credibility concerns.

Id.

15

¶183 ANNETTE KINGSLAND ZIEGLER, J. *(dissenting).* This case presents the court with a thorny issue: how must a circuit court proceed when a criminal defendant contends there exists exculpatory evidence in the hands of a private party, the evidence consists of statutorily-privileged medical records, and the alleged victim and subject of the medical records refuses to waive her privilege as to the evidence at issue?

¶184 More concretely: defendant Patrick Lynch ("Lynch") faces charges that he sexually assaulted the complainant in the 1990s. State v. Lynch, 2015 WI App 2, ¶2, 359 Wis. 2d 482, 859 N.W.2d 125. Lynch filed a motion requesting that the circuit court[1] review in camera the complainant's medical treatment records dating back to the time of the alleged abuse. Id., ¶5. According to the court of appeals below, he "submitted a detailed offer of proof in support of his motion . . . offer[ing] factual assertions and documents to support his theory that [the complainant's] treatment records contain probative, noncumulative evidence bearing on the reliability of [the complainant's] allegations against Lynch." Id., ¶11. Upon review, the circuit court concluded that there was "a reasonable likelihood that [the complainant's] treatment records contained probative, noncumulative evidence helpful to Lynch's defense." Id., ¶5. Specifically, the court determined

---

[1] The Honorable Andrew P. Bissonnette presided.

> that there was a reasonable likelihood that [the complainant's] records contain information highly damaging to [the complainant's] credibility because there is a reasonable likelihood that the records [would] reveal
>
> > (1) that [the complainant] exhibits ongoing symptoms associated with [Post-Traumatic Stress Disorder] that affect her ability to recall and describe pertinent events, and
> >
> > (2) that [the complainant] failed to report Lynch to treatment providers, at least as a child.

Id., ¶13. The complainant refused, as was her statutory prerogative, to provide the circuit court with access to her privileged treatment records. Id., ¶6. At this point, it would seem to an onlooker, the parties were at an impasse.

¶185 Such a state of affairs presents courts with the complicated task of ensuring the administration of justice considering all of the interests involved. Lynch, for example——presumed innocent until proven guilty by the State, State v. Johnson, 11 Wis. 2d 130, 144, 104 N.W.2d 379 (Dieterich, J., dissenting)——faces the possibility of being convicted as a sex offender who may, among other things, serve decades in prison, and he has a constitutional right to due process of law. See U.S. Const. amend. XIV. Conversely, the State has, among other things, an interest in pursuing its prosecution and protecting the public from criminals, yet must comply with the statutory and other rights and privileges established for the benefit of victims of crime. The complainant, however, could have, among other things, an interest in maintaining the privacy of sought-

2

after medical records. How to manage the conflicting rights and interests of all concerned?

¶186 Fortunately, this is not the first time the Wisconsin judiciary has grappled with this problem. For over two decades, its solution could be found in State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993), modified, State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298. As will be explained in detail below, Shiffra has set forth a framework which considers the interests of all involved, carefully balancing the various demands in an attempt to achieve substantial justice in a manner that upholds both the federal constitution and the laws of our state. Put differently, the Shiffra solution "attempt[s] to strike a balance between the witness's right to privacy, which is embodied in the health care provider privileges, and the truth-seeking function of our courts, which is rooted in the Due Process Clause of the Fourteenth Amendment." State v. Behnke, 203 Wis. 2d 43, 56, 553 N.W.2d 265 (Ct. App. 1996) (citation omitted). Shiffra is indeed longstanding precedent.

¶187 About ten years after Shiffra, in Green, we examined and refined the Shiffra framework. In Green we described the nature of the preliminary showing that a criminal defendant must make in order to obtain in camera review of a privilege-holder's privileged records:

> [A] defendant [must] set forth, in good faith, a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and . . . not merely cumulative to other

3

evidence available to the defendant. . . . [I]nformation will be "necessary to a determination of guilt or innocence" if it "tends to create a reasonable doubt that might not otherwise exist."

Green, 253 Wis. 2d 356, ¶34 (citation omitted). To date, Shiffra and Green remain the settled law in Wisconsin on the approach taken by courts and litigants when criminal defendants wish to obtain access to privately-held, privileged medical records.

¶188 The circuit court below dutifully worked through the Shiffra-Green framework and applied the traditional sanction which included two results: (1) the court did not violate the complainant's privilege by reviewing her privileged records; and (2) the court issued an order excluding the complainant's testimony at trial. Lynch, 359 Wis. 2d 482, ¶¶6, 45-46. The court of appeals below confirmed that the circuit court had correctly applied applicable precedent. See id., ¶1. The State now appeals, directing the brunt of its arguments, not against the reasoning of the circuit court or the court of appeals, but against the soundness of Shiffra and Green.

¶189 Some background is appropriate. Over the years, the State has made it clear that it disagrees with the Shiffra-Green line of cases. Time after time, the State has attempted to convince this court to overturn Shiffra; it has also voiced its displeasure with that case in the court of appeals. See, e.g., State v. Speese, 199 Wis. 2d 597, 610 n.12, 545 N.W.2d 510 (1996) ("The State . . . urges the court to overturn Shiffra."); Behnke, 203 Wis. 2d at 55 (discussing "the State's complaint in

4

its brief that it does not like Shiffra."); Green, 253 Wis. 2d 356, ¶21 n.4 ("The State contends that the holding in [Shiffra] was in error . . . ."); State v. Johnson, 2013 WI 59, 348 Wis. 2d 450, 832 N.W.2d 609 (per curiam), reconsideration granted, 2014 WI 16, 353 Wis. 2d 119, 846 N.W.2d 1 (per curiam) (examining, at State's request, whether Shiffra should be overruled).

¶190 For its part, the court of appeals has attempted to alleviate the State's concerns by explaining that the State "misconstrues the reasoning of . . . Shiffra." Behnke, 203 Wis. 2d at 55. And for our part, we have expressly declined to overturn Shiffra, noting that we have recognized its validity in past cases. Green, 253 Wis. 2d 356, ¶21 n.4 (citing State v. Solberg, 211 Wis. 2d 372, 386-87, 564 N.W.2d 775 (1997); State v. Rizzo, 2002 WI 20, ¶53, 250 Wis. 2d 407, 640 N.W.2d 93)).

¶191 Johnson, decided a few years ago, represents the State's most recent attempt in its campaign against Shiffra; the State was again unsuccessful. See Johnson, 353 Wis. 2d 119, ¶3 (per curiam) ("[W]e do not herein overturn or modify any precedent."). Unbowed and apparently embracing the legal maxim fiat justitia ruat caelum,[2] the State again argues that Shiffra should be overruled. The State again fails to convince this court to adopt its proposed course of action.

¶192 The Shiffra-Green line of cases, while not perfect, has provided a reasoned and reasonable approach to these

---

[2] "Let justice be done, though the heavens fall."

5

difficult questions. Under principles of stare decisis, I would not overthrow these well-established cases without "special justification," Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257 (citation omitted), and none has yet been provided. Unfortunately, some of my colleagues do not agree; I therefore write separately.

¶193 I conclude that this court should not abandon the Shiffra-Green framework and would therefore affirm the decision of the court of appeals.

### I. THE SHIFFRA-GREEN FRAMEWORK

¶194 Under Wis. Stat. § 905.04(2), "A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of the patient's physical, mental or emotional condition, among the patient" and certain specified individuals, such as the patient's physician or counselor. Wis. Stat. § 905.04(2).

¶195 When, as here, a defendant wishes to obtain access to privileged, privately-held counseling records, the Shiffra-Green framework requires that he "undertake a reasonable investigation into the victim's background and counseling through other means first before the records will be made available." Green, 253 Wis. 2d 356, ¶33. Thus "[a] motion for seeking discovery for such privileged documents should be the last step in a defendant's pretrial discovery." Id., ¶35. When requesting access to privileged records, the defendant must make "a fact-

6

specific evidentiary showing, describing as precisely as possible the information sought from the records and how it is relevant to and supports his or her particular defense." Id., ¶33. More specifically, the defendant must "set forth, in good faith, a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and . . . not merely cumulative to other evidence available to the defendant." Id., ¶34. Evidence "necessary to a determination of guilt or innocence" is evidence that "tends to create a reasonable doubt that might not otherwise exist." Id. (citation omitted). This is not by any means intended to be a trivial burden; "mere speculation or conjecture" is insufficient. See id., ¶33. Additionally, "[a] good faith request will often require support through motion and affidavit from the defendant." Id., ¶35.

¶196 If the circuit court determines that the defendant has met his burden, it reviews the records at issue in camera, unless the privilege-holder——in cases such as this one, also the alleged victim——refuses to authorize review. See Shiffra, 175 Wis. 2d at 612; Lynch, 359 Wis. 2d 482, ¶¶5-6. "If the victim does not consent, there is no in camera review and the victim is barred from testifying." Johnson v. Rogers Mem'l Hosp., Inc., 2005 WI 114, ¶73, 283 Wis. 2d 384, 700 N.W.2d 27 (plurality opinion) (citing Shiffra, 175 Wis. 2d at 612). If the alleged victim does consent, however, the court reviews the records in camera to ascertain whether they contain "any relevant information that is 'material' to the defense of the accused."

7

*Solberg*, 211 Wis. 2d at 386 (citation omitted). The standard applied by the court during its in camera review is even more demanding than the initial burden that must be met by the defendant to obtain that review. See *Green*, 253 Wis. 2d 356, ¶31.

¶197 If the records at issue do not contain information meeting the standard just described, no information is released to the defendant. *Solberg*, 211 Wis. 2d at 387. If the records do contain relevant information material to the defense of the accused, the information is disclosed to the defendant, unless the alleged victim refuses to authorize disclosure. Id. at 386-87.[3]

¶198 The *Shiffra*-*Green* framework, which "giv[es] the defendant an opportunity to have the circuit court conduct an [in camera] review of the privileged records, while still allowing the patient to preclude that review, addresses both the interests of the defendant and the patient." Id. at 387 (citation omitted). "Under the due process clause, criminal defendants must be given a meaningful opportunity to present a complete defense." *Shiffra*, 175 Wis. 2d at 605 (citation omitted). On the other hand, "[t]he public policy underpinning

---

[3] Of course, if any information is released, the court still retains "reasonable control over the mode and order of interrogating witnesses and presenting evidence" at trial. Wis. Stat. § 906.11. The court has the duty to exercise this control in order to "[m]ake the interrogation and presentation effective for the ascertainment of the truth[;] [a]void needless consumption of time[; and] [p]rotect witnesses from harassment or undue embarrassment." Id.

the [Wis. Stat. § 905.04] privilege is to encourage patients to freely and candidly discuss medical concerns with their physicians by ensuring that those concerns will not unnecessarily be disclosed to a third person." Solberg, 211 Wis. 2d at 387 (citation omitted). Thus, there is a quadruple-layer of protection in place for privilege-holders: a privilege-holder's consent to disclosure is required at two stages (prior to in camera review and after in camera review), the defendant must make the challenging Green showing before he is granted in camera review of privileged records, and the circuit court applies an even stricter standard to its in camera review of those records before determining whether any evidence should be disclosed to the defendant.

¶199 The existing procedure "strikes an appropriate balance between the defendant's due process right to be given a meaningful opportunity to present a complete defense and the policy interests underlying the Wis. Stat. § [905.04(2)] privilege." Id. First, fishing expeditions by the defense are prohibited. Green, 253 Wis. 2d 356, ¶33. Second, if the privilege holder does not wish to disclose the records, they will not be disclosed. See Shiffra, 175 Wis. 2d at 612. Third, should a circuit court conclude that a defendant makes a Green preliminary showing for an in camera review, and should the privilege-holder refuse to allow the court to conduct that review, a defendant's right to a fair trial is safeguarded by barring the privilege-holder's testimony at trial. Id. After all, the defendant has by that time "demonstrat[ed] a reasonable

9

likelihood that the [privilege-holder's] records contain relevant information <u>necessary</u> to a determination of guilt or innocence and . . . not merely cumulative to other evidence available to the defendant." <u>Green</u>, 253 Wis. 2d 356, ¶34 (emphases added). "Under the circumstances," preclusion of the privilege-holder's testimony is warranted as "the only method of protecting [the defendant's] right to a fair trial." <u>Shiffra</u>, 175 Wis. 2d at 612.

¶200 Regrettably, there are occasions when defendants are wrongfully accused of committing a sexual assault. In those instances, the alleged victim would be the most likely to refuse access to those records, particularly if exculpatory information exists within those records. Unfortunately, the lead opinion falls short of contemplating this scenario when it bars access to an alleged victim's privileged, privately-held records no matter the circumstances. Simply stated, the procedure outlined by the lead opinion forecloses any opportunity to rebut the allegations through the use of an alleged victim's records, even when the defendant meets the high standard required by <u>Green</u>.[4]

---

[4] In cases such as this one where the defendant has met the significant hurdles established in the <u>Green</u> standard and the privilege-holder refuses to consent to in camera review, the lead opinion has nonetheless concluded that otherwise accessible, potentially exculpatory evidence has constitutionally been placed outside of the reach of the defendant. The lead opinion dismisses our concern over the potential violation of the defendant's constitutional rights, tacitly characterizing it as an emotional appeal. If the constitutional right to present a defense has emotional appeal, it is because I feel strongly that our constitutional rights ought to be protected. The lead opinion's assurances that somehow the criminal justice system otherwise prevents wrongful

(continued)

convictions, in the absence of the Shiffra-Green framework, ring hollow.

The lead opinion concludes that meaningful constitutional protections are afforded to a defendant, because a defendant has certain general safeguards, such as a presumption of innocence and the right to an adversarial process. The lead opinion concludes that these protections alone avert erroneous convictions, but these protections alone do not directly address the need for a defendant to access privileged, privately-held records in order, for example, to present a meaningful defense or adequately cross-examine——fundamental to the adversarial process. True, the presumption of innocence is a safeguard, in the same way that providing defendants with a trial in the first place is a safeguard: necessary, important, but ultimately not germane to the specific concern in these types of cases: a privilege-holder's refusal to consent to in camera review of privileged, privately-held records reasonably likely to contain relevant information necessary to a determination of the defendant's guilt or innocence and not merely cumulative to other evidence available to the defendant. State v. Green, 2002 WI 68, ¶19, 253 Wis. 2d 356, 646 N.W.2d 298

The lead opinion urges trust in our adversary legal system, but our "adversary legal system . . . depends upon the availability of relevant evidence," Nixon v. Administrator of General Services, 433 U.S. 425, 477 (1977), to say nothing of the availability of "information necessary to a determination of guilt or innocence and . . . not merely cumulative to other evidence available to the defendant." Green, 253 Wis. 2d 356, ¶34. I acknowledge the grave importance of ensuring the privacy of the records at issue in this case. At the same time, when evidence potentially so relevant to the question of a defendant's guilt is placed out of the defendant's reach, there is legitimate cause for concern. We do expect juries to reach valid results, but they are unable to do so when they are only presented with the evidence favorable to one side of a prosecution. This is what causes individuals to lose, not gain, faith in the criminal justice system.

Additionally, the lead opinion explains that because in cases such as the current one the prosecution does not have access to a complainant's privileged mental health care records either, defendants are not placed in a disadvantageous position vis-à-vis the State. But Wisconsin case law has already addressed this argument:

(continued)

11

Is it so clear that this procedure is preferable to the one that has been in place for over two decades?  I think not.

¶201 The Shiffra-Green framework provides a workable solution to a difficult problem.  Perhaps suggesting its intrinsic equity, the framework forces every party involved——the defendant, the privilege-holder, the State——to shoulder a burden of some kind.  The defendant must meet the required evidentiary

> In those situations when the State does not have access to the records because the witness has asserted a health care provider privilege, . . . the State believes that the requirement for an in camera review set out in Ritchie should not apply. . . .  [The State] sees no potential unfairness in such situations because neither the State nor the defendant can use the records.  The playing field is kept completely level.
>
> The State, however, misconstrues the reasoning of Ritchie and Shiffra.  These decisions are not about keeping a level playing field between the State and the defendant.  Rather, these decisions attempt to strike a balance between the witness's right to privacy, which is embodied in the health care provider privileges, and the truth-seeking function of our courts, which is rooted in the Due Process Clause of the Fourteenth Amendment.

State v. Behnke, 203 Wis. 2d 43, 55-56, 553 N.W.2d 265 (Ct. App. 1996) (citation omitted).

Finally, the lead opinion refers to the State's obligation under Brady v. Maryland, 373 U.S. 83 (1963), and to the possibility that future legislative or judicial developments will provide a new justification for use of the Shiffra-Green framework.  Again, these considerations do not address the pressing concern in this case: a privilege-holder's refusal to consent to in camera review of currently-privileged, privately-held records reasonably likely to contain relevant information necessary to a determination of the defendant's guilt or innocence and not merely cumulative to other evidence available to the defendant.  Green, 253 Wis. 2d 356, ¶19.

showings, is never allowed his own review of the records at issue prior to final disclosure, and may nevertheless lose access to the records if the privilege-holder does not consent to disclosure. The privilege-holder must choose between limited disclosure of privileged evidence which is reasonably likely to contain relevant, non-cumulative information necessary to a determination of the defendant's guilt or innocence and preclusion of her testimony at trial. Finally, the State faces the possibility that its prosecution will be "hampered by a witness who strives to maintain privacy." Behnke, 203 Wis. 2d at 55.

¶202 The State has lodged understandable complaints against the effect the Shiffra-Green framework has on the prosecution of its cases.

> We . . . acknowledge that the "costs" of the health care provider privileges are principally shifted to the State. In a few circumstances, the State may have to completely forgo a case when one of its witnesses refuses to turn over the information. Nonetheless, the Due Process Clause guarantees the defendant a right to a trial based on truth seeking which can only be accomplished by allowing him or her to present a complete defense. The Due Process Clause thus prevents the State from shifting the costs associated with the health care provider privileges to criminal defendants. . . .

> The State also complains about the practical effects of the Shiffra decision on its ability to prosecute a case. It believes that forcing the State to pressure its witness into releasing the information or forgoing this witness's testimony is not fair. The State asserts that it should not be forced to make its witness reveal private information. And a witness, most likely the accuser, should not be forced to disclose private and personal information to have the defendant brought to justice.

These complaints, however, were addressed in Shiffra, and the remedy set out in that case is still valid. Before the defendant is allowed access to these records and the witness's privacy is sacrificed, and before the State is faced with the decision of whether it can forgo the witness and still make its case, the records must pass through a private and confidential review in the trial court's chambers. We have complete confidence in this state's trial judges to accurately and fairly balance the witness's right to privacy and the defendant's right to a trial where every piece of evidence material to determining the truth will be considered. The State overestimates the burden that Shiffra places on it and its witnesses.

Behnke, 203 Wis. 2d at 56-57 (citations omitted).

¶203 The Behnke court's discussion provides a window into the State's view of the matter. The State again asks this court to abandon the Shiffra-Green framework by overturning Shiffra or by modifying Shiffra's holding to allow for remedies other than preclusion of the privilege-holder's testimony. Certain of my colleagues would grant the State's request. I would not and will now discuss why the court should not now abandon the Shiffra-Green framework.

II. THIS COURT SHOULD NOT ABANDON THE SHIFFRA-GREEN FRAMEWORK.

A. This Court Should Not Overrule Shiffra.

¶204 The State and the lead opinion would upend over two decades of precedent by overruling Shiffra, despite the fact that this court has already explicitly refused to do so. Green, 253 Wis. 2d 356, ¶21 n.4.[5] What has changed since Green?:

---

[5] To put the time period during which Wisconsin courts have relied on Shiffra in perspective, I note that Shiffra was decided the same year as Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

14

Nothing that has any bearing on the legal questions in this case. What should now cause us to uproot decades of precedent? Such unpredictability on the part of this court is inimical to the rule of law. Johnson Controls, 264 Wis. 2d 60, ¶94 ("[R]espect for prior decisions is fundamental to the rule of law."). When our law "is open to revision in every case, 'deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results.'" Id. (citation omitted). Although often repeated, it is appropriate to again set out the important rationales for stare decisis:

> [1] the desirability that the law furnish a clear guide for conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; [2] the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and [3] the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments.

Id., ¶95 (citation omitted). Stare decisis "promotes evenhanded, predictable, and consistent development of legal principles . . . and contributes to the actual and perceived integrity of the judicial process." Id. (citation omitted). Twice now in the past few years this court has wrestled with the problem at issue in this case and created confusion in the lower courts. Johnson, 348 Wis. 2d 450 (per curiam), reconsideration granted, 353 Wis. 2d 119 (per curiam). All the more reason to follow precedent today.

¶205 "[S]pecial justification is required to overturn prior decisions," and "[t]he reasons for rejecting any established rule of law must always be weighed against" the rationales

15

underlying stare decisis. Johnson Controls, 264 Wis. 2d 60, ¶¶95-96. When considering overturning prior case law, this court may examine a series of concerns: (1) whether there have been "changes or developments in the law [which] have undermined the rationale behind a decision"; (2) whether there is "a need to make a decision correspond to newly ascertained facts"; (3) whether there has been "a showing that the precedent has become detrimental to coherence and consistency in the law"; (4) "whether the prior decision is unsound in principle"; (5) "whether [the prior decision] is unworkable in practice"; (6) "whether reliance interests are implicated"; (7) "whether the prior case was correctly decided"; and (8) "whether it has produced a settled body of law." Id., ¶¶98-99 (citations omitted).

¶206 Most, if not all, of these considerations counsel against overturning Shiffra and Green. But the State and the lead opinion share the same fundamental complaint with regard to the Shiffra-Green framework: they believe that Shiffra improperly interpreted and applied the case upon which it principally relied, Pennsylvania v. Ritchie, 480 U.S. 39 (1987). Shiffra, 175 Wis. 2d at 603. In Ritchie the Supreme Court relied on the Due Process Clause of the Fourteenth Amendment, Brady v. Maryland, 373 U.S. 83 (1963), and other case law for its conclusion that the trial court in that case was required to review in camera confidential records in the hands of a state protective service agency in order to determine whether the records contained information that "probably would have changed

16

the outcome" of a criminal defendant's trial. Ritchie, 480 U.S. at 43, 57-58.

¶207 Specifically, the lead opinion argues that Shiffra represents an unwarranted application of Ritchie, because: (1) Shiffra involved privileged records, whereas Ritchie involved confidential records; (2) Wis. Stat. § 905.04(2) contains no exception allowing for release by court order, whereas the statute at issue in Ritchie did contain such an exception; and (3) the records in Shiffra were held by a private entity, whereas the records in Ritchie were held by a state protective service agency "charged with investigating cases of suspected mistreatment and neglect." Ritchie, 480 U.S. at 43. This last distinction is essentially echoed by the State.

¶208 Before turning to these objections, let us assume for a moment that the State and the lead opinion are correct that Shiffra was wrong to premise its holding on Ritchie.

> Respecting stare decisis means sticking to some wrong decisions. The doctrine rests on the idea, as Justice Brandeis famously wrote, that it is usually "more important that the applicable rule of law be settled than that it be settled right." Indeed, stare decisis has consequence only to the extent it sustains incorrect decisions; correct judgments have no need for that principle to prop them up. Accordingly, an argument that we got something wrong——even a good argument to that effect——cannot by itself justify scrapping settled precedent. Or otherwise said, it is not alone sufficient that we would decide a case differently now than we did then. To reverse course, we require as well what we have termed a "special justification"——over and above the belief "that the precedent was wrongly decided."

17

Kimble v. Marvel Entm't, LLC, 576 U.S. ___, 135 S. Ct. 2401, 2409 (2015) (emphasis added) (citations omitted).[6] In 2002 the

---

[6] The lead opinion's suggestion that this statement of law is inapplicable in a constitutional case is not correct. In the section of Kimble v. Marvel Entertainment, LLC, 576 U.S. ___, 135 S. Ct. 2401 (2015), cited above, the Supreme Court discussed stare decisis in general terms and in fact cited Payne v. Tennessee, 501 U.S. 808, 827-28 (1991), a constitutional case, in the first paragraph of that section. Kimble, 135 S. Ct. at 2409 (citation omitted). The Court also discussed stare decisis in the context of decisions interpreting statutes. This latter discussion is the one quoted by the lead opinion. See id.

For example, in Dickerson v. United States, the Supreme Court considered legislation bearing on Miranda v. Arizona, 384 U.S. 436 (1966), and considered whether it should overrule that case. Dickerson, 530 U.S. 428, 431-32 (2000). The Court concluded: "We hold that Miranda, being a constitutional decision of this Court, may not be in effect overruled by an Act of Congress, and we decline to overrule Miranda ourselves." Id. at 432. A portion of the Dickerson Court's discussion of stare decisis is informative for purposes of this case:

> Whether or not we would agree with Miranda's reasoning and its resulting rule, were we addressing the issue in the first instance, the principles of stare decisis weigh heavily against overruling it now. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 304, 100 S. Ct. 1682, 64 L.Ed.2d 297 (1980) (Burger, C.J., concurring in judgment) ("The meaning of Miranda has become reasonably clear and law enforcement practices have adjusted to its strictures; I would neither overrule Miranda, disparage it, nor extend it at this late date."). While "'stare decisis is not an inexorable command,'" particularly when we are interpreting the Constitution, "even in constitutional cases, the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some 'special justification.'"

> We do not think there is such justification for overruling Miranda.

Id. at 443 (some citations omitted) (emphasis added).

(continued)

18

Green court understood that fact. Green, 253 Wis. 2d 356, ¶21 n.4 ("[T]his court [has] recognized the validity of Shiffra in State v. Solberg, 211 Wis. 2d 372, 386-87, 564 N.W.2d 775 (1997), and in State v. Rizzo, 2002 WI 20, ¶53, 250 Wis. 2d 407, 640 N.W.2d 93. We will not depart from this precedent.").

¶209 Thus, although the State and the lead opinion have undeniably identified distinctions between Shiffra and Ritchie, the relevant question is whether these distinctions warrant upheaval of a "settled body of law."[7] Johnson Controls, 264 Wis. 2d 60, ¶99; see Daniel D. Blinka, The Shiffra Procedures: Production of a Witness's Privileged Health Care Records, 7 Wis. Prac., Wis. Evidence § 511.2 (discussing "the Shiffra doctrine"); see also Wisconsin District Attorneys Association, Wisconsin Prosecutor's Domestic Abuse Reference Book, ch. 13 (2d ed. 2012) ("Discovery of Medical Records of Victims and Witnesses: Shiffra-Green and Related Cases").

¶210 Turning to the merits of the objections raised: Was Shiffra "unsound in principle"? Johnson Controls, 264 Wis. 2d 60, ¶99. That is, was it wrong to extend the reasoning

_____

Shiffra-Green has striking similarities to the development of Miranda. Both developed out of underlying constitutional principles rather than the words of the constitution itself. Given the above precedent, consider the words "Shiffra-Green" in place of "Miranda" in the above quotation to analyze whether stare decisis applies in the case at issue.

[7] For instance, the Shiffra court itself recognized that it was using Ritchie's postconviction analysis in a pretrial context, and thus already was not simply engaged in a straightforward application of that case. See State v. Shiffra, 175 Wis. 2d 600, 606-09, 499 N.W.2d 719 (Ct. App. 1993).

19

in Ritchie to privately-held records?  Nationwide, the jury is
still out on that question:

> Since the due process obligation of the
> prosecution under Brady extends only to evidence
> within its control, an issue left open in Ritchie is
> whether a subpoena . . . directed to a private party
> or an unrelated governmental agency carries similar
> constitutional protection.  Many lower courts, in
> dealing with records similar to those involved in
> Ritchie, have ordered the same type of in camera
> review as required there without regard to whether the
> records were sought from a related state agency or a
> private hospital.

Wayne R. LaFave et al., 6 Criminal Procedure § 24.3(f) & n.207
(4th ed. 2015) (collecting cases); Burns v. State, 968 A.2d
1012, 1024-25 & n.41 (Del. 2009) (same).  Additionally, at least
one state court has allowed access to the type of information at
issue on constitutional grounds unrelated to the Due Process
Clause, which is why the lead opinion undertakes the Herculean
task of negating any other constitutional basis for Shiffra in
order to demonstrate that Shiffra is indeed "unsound in
principle."  See Commonwealth v. Barroso, 122 S.W.3d 554, 561
(Ky. 2003) ("[W]e conclude that the Compulsory Process Clause
affords a criminal defendant the right to obtain and present
exculpatory evidence, including impeachment evidence, in the
possession of a third party that would otherwise be subject to
the psychotherapist-patient privilege.").  One might think that
the unsettled nature of the question across the country would
counsel restraint when considering upsetting the settled case
law on the question in Wisconsin, pending further guidance from
the Supreme Court on the issue.  But the State and the lead

20

opinion are confident that the Shiffra and Green courts got it so wrong that drastic action is needed.

¶211 The lead opinion's distinctions between Ritchie and Shiffra do not inescapably lead to the conclusion that Shiffra must be overruled. For example, the lead opinion makes much of the fact that the statute at issue in Ritchie contained an exception allowing an agency to disclose records at issue to a "court of competent jurisdiction pursuant to a court order." Ritchie, 480 U.S. at 44. It is true that Wis. Stat. § 905.04 does not contain such an exception. But neither is the statute one that grants a private party "the absolute authority to shield its files from all eyes." Ritchie, 480 U.S. at 57. In fact, Wis. Stat. § 905.04 currently contains about 11 exceptions. Wis. Stat. § 905.04(4) ("Exceptions").[8] The state statute which the Ritchie court cited as an example of an "unqualified statutory privilege" contained no exceptions. Ritchie, 480 U.S. at 57 (citing 42 Pa. Cons. Stat. § 5945.1(b)).

¶212 In a footnote, the Ritchie court "express[ed] no opinion on whether the result in this case would have been different if the statute had protected the [protective service agency's] files from disclosure to anyone, including law-enforcement and judicial personnel." Ritchie, 480 U.S. at 57 n.14. Wisconsin Stat. § 905.04 allows disclosure to both law-enforcement and judicial personnel. See, e.g. Wis. Stat.

---

[8] Coincidentally, the statute at issue in Ritchie also contained 11 exceptions. Pennsylvania v. Ritchie, 480 U.S. 39, 43 (1987).

21

§ 905.04(4)(d) ("There is no privilege in trials for homicide when the disclosure relates directly to the facts or immediate circumstances of the homicide."); Wis. Stat. § 905.04(4)(e)2m. ("There is no privilege for information contained in a report of child abuse or neglect that is provided under s. 48.981(3)."). And even if the statute did not allow such disclosure, the Ritchie court "express[ed] no opinion" on the potential distinction. Ritchie, 480 U.S. at 57 n.14. This hardly supports a conclusion that Shiffra was "unsound in principle" in extending Ritchie's principles to the facts at issue in that case.[9]

¶213 Second, the lead opinion's confidentiality-vs.-privilege distinction is not one that was emphasized by the Ritchie court. And it is far from clear that the Ritchie court's analysis would have been any different had the statute at issue been a privilege statute. See, e.g., Ritchie, 480 U.S. at 43 ("[The protective service agency] refused to comply with the subpoena, claiming that the records were privileged under Pennsylvania law."); id. at 52 (plurality opinion) (stating that a statute in a prior case rendered information presumptively confidential, then referring to that statute as creating a

---

[9] It bears repeating here that Shiffra and Green do not create a statutory exception to a privilege where one does not exist. The cases do not create blanket authorization for in camera review of privileged materials. Instead, should the proper showing be made, and should a privilege-holder refuse to consent to in camera review, the privilege-holder is barred from testimony at trial and her privilege remains intact. See Shiffra, 175 Wis. 2d at 612.

22

statutory privilege); id. at 57 ("The Commonwealth, however, argues that no materiality inquiry is required, because a statute renders the contents of the file privileged."). And indeed, we are not the only jurisdiction that has failed to give the distinction dispositive weight. Burns, 968 A.2d at 1024. The lead opinion's purported distinction does not rise to the level of a "special justification" warranting the elimination of 20 years of Wisconsin case law.

¶214 Finally, reading the lead opinion, one almost comes away with the conclusion that Shiffra relied directly on Brady rather than on Ritchie.[10] Nowhere does the Ritchie court state, as the lead opinion hesitantly admits, that the fact that the protective service agency in that case was tasked with investigating "cases of suspected [child] mistreatment and neglect" thereby made it an arm of the prosecution. Indeed, the Supreme Court cases cited by the lead opinion for its reasoning on this point were not published until years after Ritchie, and thus were not in the contemplation of the Ritchie court. The lead opinion's interpretation of Ritchie may "make[] sense" in retrospect, but it does not banish all doubt that the Ritchie court might have had broader principles in mind at the time it decided its opinion.

---

[10] In fact, during the Ritchie court's discussion of whether the criminal defendant in that case was "entitled to have the [protective service agency] file reviewed by the trial court to determine whether it contains information that probably would have changed the outcome of his trial," the court cited Brady exactly one time. Ritchie, 480 U.S. at 57.

23

¶215 To be sure, Ritchie relied on principles taken from Brady. Ritchie, 480 U.S. at 57; see District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 61 (2009) ("The Court of Appeals affirmed, relying on the prosecutorial duty to disclose exculpatory evidence recognized in Pennsylvania v. Ritchie, 480 U.S. 39 (1987), and Brady v. Maryland, 373 U.S. 83 (1963)."). But it is not evident that that necessarily forecloses application of Ritchie to a broader set of circumstances. See, e.g., Burns, 968 A.2d at 1024-25 ("Although Ritchie involved the disclosure of records in the possession of the State, nothing in the Ritchie Court's holding or analysis limits its application to records held by the State. . . . From the standpoint of the privilege holder it is immaterial whether the holder's therapy records are in the possession of a private party or the State. In either circumstance, the privilege holder has the identical interest in non-disclosure."); cf. State v. Cressey, 628 A.2d 696, 703 (N.H. 1993) (citing State v. Gagne, 612 A.2d 899 (N.H. 1992)) ("Gagne did not distinguish between the privileged records of a State agency and the privileged records of a private organization. The rationale in Gagne, balancing the rights of a criminal defendant against the interests and benefits of confidentiality, applies equally in both cases. A record is no less privileged simply because it belongs to a State agency. Likewise, a defendant's rights are no less worthy of protection simply because he seeks information maintained by a non-public entity.").

24

¶216 Our court of appeals——in one of the numerous cases the lead opinion would abrogate today——has rejected the notion that Ritchie and Shiffra are about "keeping a level playing field between the State and the defendant." Behnke, 203 Wis. 2d at 55-56. Instead, "these decisions attempt to strike a balance between the witness's right to privacy, which is embodied in the health care provider privileges, and the truth-seeking function of our courts, which is rooted in the Due Process Clause of the Fourteenth Amendment." Id. Although the lead opinion reads Ritchie as a more-or-less clear-cut application of Brady, I am not convinced that this is the only reasonable reading of the Ritchie court's brief and enigmatic analysis, such that Shiffra must be overruled. See Ritchie, 480 U.S. at 57-58.[11] The question is less about which position is correct, and more about whether the mere possibility of error justifies such a monumental shift in Wisconsin law. See Johnson Controls, 264 Wis. 2d 60, ¶¶94-96.

---

[11] Other jurisdictions appear to be in accord with Wisconsin's current approach. See Clifford F. Fishman, Defense Access to a Prosecution Witness's Psychotherapy or Counseling Records, 86 Or. L. Rev. 1, 18 (2007) ("Where a defendant has established a constitutional right to the disclosure of privileged information, but the statutory privilege is absolute on its face, some courts have held that the witness retains the privilege: a court cannot disclose unless the witness waives the privilege. Absent such a waiver, if the defendant adequately demonstrates the need for an in camera review or disclosure of the records, the witness is precluded from testifying. If he or she has already testified, his or her testimony is stricken from the record. States following this approach include Connecticut, Michigan, Nebraska, New Mexico, Wisconsin, and South Dakota" (footnotes omitted) (citations omitted).).

25

B. This Court Should Not Modify Shiffra.

¶217 If Shiffra is not overturned, the State asks this court to modify Shiffra to allow for alternative remedies when a defendant makes the showing required by Green and the privilege-holder refuses to allow the circuit court to conduct an in camera review of the privilege-holder's records. Certain of the justices on this court agree with the State's suggestion. I am not yet convinced that we should modify Shiffra.

¶218 To be clear, when the Shiffra court stated that "[u]nder the circumstances, the only method of protecting Shiffra's right to a fair trial was to suppress [the privilege-holder's] testimony if she refused to disclose her records," it meant that no other method is available in these types of cases——"[i]n this situation, no other sanction would be appropriate." Shiffra, 175 Wis. 2d at 612.[12] As a preliminary

---

[12] The court of appeals below correctly explained:

[W]e agree with the circuit court that we are bound by plain language in Shiffra that forecloses alternative remedies.

. . .

Shiffra's use of "In this situation" and "Under the circumstances," read in context, is plainly a reference to the "situation" or "circumstance" in which a defendant makes the required showing and the victim refuses to authorize release of the records for an in camera review. There is nothing in Shiffra suggesting that the use of this language was meant to restrict the holding to some unspecified subset of situations or circumstances in which a defendant makes the required showing and the victim refuses to release records.

(continued)

matter, the discussion in Shiffra thus essentially disposes of the State's arguments that there are other remedies available, namely: (1) use of an exception in a statute not at issue, Wis. Stat. § 146.82(2)(a)4., to compel production of privileged records; and (2) use of a case-by-case balancing test to determine whether a privilege-holder should be allowed to testify even after refusing to disclose privileged records.

¶219 More specifically, the State's first proposed solution is plainly nothing more than wishful thinking. The State would bypass the privilege-holder's refusal to allow in camera review——as is the privilege-holder's right under Wis. Stat. § 905.04(2)——by using an exception to Wis. Stat. § 146.82, "Confidentiality of patient health care records." Section 146.82(2)(a)4. allows access to patient healthcare records rendered confidential by that statute "without informed consent"

---

State v. Lynch, 2015 WI App 2, ¶¶42-43, 359 Wis. 2d 482, 859 N.W.2d 125.

I recognize that Shiffra's author has voiced, in an unpublished dissent, his disagreement with this interpretation of Shiffra. State v. Johnson, No. 2011AP2864-CRAC, unpublished slip op., ¶24 (Wis. Ct. App. Apr. 18, 2012), aff'g as modified by 2013 WI 59, 348 Wis. 2d 450, 832 N.W.2d 609. Ignoring other problems with reliance on this type of post-decision "judicial history," I note that two other judges joined the Shiffra opinion and may have had a different view of the case. I also note that both the majority in the unpublished Johnson case and the court of appeals below disagree with the Johnson dissent's reading of Shiffra. See Johnson, unpublished slip op., ¶¶16-18; Lynch, 359 Wis. 2d 482, ¶¶42-43. I agree with these five judges that Shiffra's language does not admit of any alternative remedies.

27

pursuant to "a lawful order of a court of record." § 146.82(2)(a)4.

¶220 It would seem to go without saying that an exception in one statute ordinarily does not operate as an exception in another statute. Wisconsin Stat. § 146.82 currently contains almost two dozen exceptions. Wis. Stat. § 146.82(2). Should all of them operate as exceptions to Wis. Stat. § 905.04(2)? Such an outcome could only be achieved by legislating words into the statutory text.

¶221 The fact that Wis. Stat. § 905.04(2) and Wis. Stat. § 146.82 may be in pari materia does not alter the analysis. "[S]tatutes which are in pari materia are to be read together and harmonized where that is possible." State v. Walker, 75 Wis. 2d 93, 102, 248 N.W.2d 410 (1977) (citation omitted); see also In pari materia, Black's Law Dictionary 911 (10th ed. 2014) ("It is a canon of construction that statutes that are in pari materia may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject."). But there is nothing to harmonize here; the two statutes are consistent with each other. There might be legitimate reasons for the existence of a judicial-order exception in one statute but not the other. See, e.g., State v. Denis L. R., 2005 WI 110, ¶57 n.21, 283 Wis. 2d 358, 699 N.W.2d 154 (Wis. Stat. § 905.04 and Wis. Stat. § 146.82 "must be read together in pari materia to avoid any conflicts" (emphasis added).). Further, there is no ambiguity to resolve in Wis. Stat. § 905.04(2) for purposes of this case that would require

28

reference to Wis. Stat. § 146.82; Wisconsin Stat. § 905.04(2) is clear in its effect. We cannot ignore the plain language of the privilege statute and create an exception where none exists simply to reach a desired result. That is why, under the Shiffra-Green framework, if the privilege-holder does not consent to review of her records, those records are not reviewed——even if a defendant makes a Green showing.[13]

¶222 The State's second proposed remedy is for courts to "balance," in each individual case, "the defendant's constitutional rights against the witness's right to privacy in her privileged records" and against the State's interests. Put differently, the State argues that after a defendant makes a Green showing and the privilege-holder refuses to consent to review of her records, courts should conduct a balancing

---

[13] At one point in its brief the State characterizes use of Wis. Stat. § 146.82(2)(a)4. as a "graft[ing]" of a "constitutional exception" to Wis. Stat. § 905.04. The State seems to be arguing that § 905.04 would be unconstitutional as applied in certain cases because it does not contain an exception allowing the defendant access to privileged records.

One of the benefits of the Shiffra-Green framework is that it alleviates concerns about the protection of the defendant's constitutional rights without requiring consideration of the potential invalidation of Wis. Stat. § 905.04. Cf. Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 328 (2006) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. . . . [W]e try not to nullify more of a legislature's work than is necessary, for we know that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people'" (citation omitted).); Shelby County, Ala. v. Holder, 570 U.S. ___, 133 S. Ct. 2612, 2631 (2013) ("Striking down an Act of Congress 'is the gravest and most delicate duty that this Court is called on to perform'" (citation omitted).).

analysis in order to determine whether the privilege-holder may nonetheless testify. The problem with this suggestion is that this balancing is already built into the Shiffra-Green framework. To be clear, the defendant is not entitled to a fishing expedition of the alleged victim's privileged records. In each case, in order to establish any claim to privileged records, a defendant must "set forth, in good faith, a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and . . . not merely cumulative to other evidence available to the defendant." Green, 253 Wis. 2d 356, ¶34. The interests of a defendant who has made this showing are weightier than the interests of a defendant who has not made this showing, and sufficiently weighty to require preclusion of a privilege-holder's testimony, should the privilege-holder not consent to release of the records. Further weighing is unnecessary and inappropriate. See Shiffra, 175 Wis. 2d at 608-09 (analogizing the defendant's initial burden to "cases in which a defendant seeks disclosure of a government informant's identity," and stating, "[b]oth situations require us to balance the defendant's constitutional right to a fair trial against the state's interest in protecting its citizens by upholding a statutorily created privilege.").

¶223 From all that has already been said, it is easy to see why neither of the State's proposals provide an adequate remedy. The first solution ignores the privilege-holder's statutory right. The second solution ignores the defendant's

constitutional right. Both thus upset the careful balance struck by Shiffra and Green. See Solberg, 211 Wis. 2d at 387.

### III. THE DISPOSITION OF THIS CASE

¶224 The amalgam of opinions in this case is potentially confusing. In Johnson, 348 Wis. 2d 450 (per curiam), reconsideration granted, 353 Wis. 2d 119 (per curiam), a similar jumble of opinions required this court to grant a motion for reconsideration to clarify its earlier opinion. See id. Therefore, before I conclude, I wish to discuss briefly the disposition of this case in order to provide guidance to the litigants below so that the parties need not file, as they did in Johnson, a motion in order to obtain clarification of the effect of the court's decision. Simply stated, the parties in this case are in the same position as the parties in Johnson: the decision of the court of appeals remains the law of the case.

¶225 More specifically, Justice Gableman, Chief Justice Roggensack, and Justice Rebecca Bradley would overrule Shiffra and Green and reverse the decision of the court of appeals. But, because these three justices do not command a majority of the court, Shiffra and Green are not overruled.

¶226 Justice Ann Walsh Bradley and Justice Abrahamson would modify the Shiffra-Green framework and reverse the decision of the court of appeals. But because these two justices do not

31

command a majority of the court, the Shiffra-Green framework is not modified.[14]

¶227 Although these five justices would all reverse the decision of the court of appeals, no majority agrees on a rationale for doing so. As no precedent is changed by the opinions of these five justices, reversal of the court of appeals would run contrary to existing precedent, namely Shiffra and Green. See Johnson, 353 Wis. 2d 119, ¶5 (per curiam) ("The

---

[14] To be clear, adhering to Shiffra and Green means adhering to the single remedy established in that line of cases: preclusion of the privilege-holder's testimony under the circumstances specified in those cases. As we made clear in our opinion granting the motion for reconsideration in Johnson, the privilege-holder's "decision to produce and the consequence of whether testimony is allowed cannot be separated." State v. Johnson, 2014 WI 16, ¶5, 353 Wis. 2d 119, 846 N.W.2d 1 (per curiam). By permitting additional remedies, Justice Ann Walsh Bradley and Justice Abrahamson would, like the members of the lead opinion, overrule Shiffra (albeit on grounds separate from those relied upon by the members of the lead opinion) and reverse the decision of the court of appeals below.

Although Justice Ann Walsh Bradley and Justice Abrahamson agree with the court of appeals that Lynch made the Green showing entitling him to in camera review of the complainant's privileged mental health records, that part of the decision of the court of appeals is not disputed, is not currently before this court, and is not analyzed in the lead opinion. Instead, this court is addressing whether the Shiffra-Green framework should be overruled.

The court of appeals below applied the Shiffra-Green framework as established in our case law, including the single remedy provided for under that framework. See Lynch, 359 Wis. 2d 482, ¶¶39, 42. Justice Ann Walsh Bradley and Justice Abrahamson would depart from that court's straightforward application of Shiffra and Green. Thus, regardless of their own descriptions of their opinion, Justice Ann Walsh Bradley and Justice Abrahamson would simply reverse the decision of the court of appeals.

32

prior per curiam was incorrect to convey that a majority could be reached by separating whether the medical records must be produced from whether the victim may testify because such a separation would produce new criteria that a majority of the court has not authorized.").

¶228 Finally, Justice Prosser and I would today reaffirm Shiffra, Green, and the Shiffra-Green framework and would affirm the decision of the court of appeals. But as two justices, we do not command a majority of the court.

¶229 Nevertheless, "no [four] justices reach agreement to either affirm, reverse, or modify the decision of the court of appeals consistent with precedent. Consequently, the court of appeals decision remains the law of the case." Johnson, 353 Wis. 2d 119, ¶2 (per curiam). In other words, the law in Wisconsin remains as it was before the appeal to this court occurred. This case should not be read to overturn or modify any existing law, including Shiffra and Green.[15]

## IV. CONCLUSION

¶230 We should tread lightly in this complex area of the law, upsetting precedent only when compelled to do so by some "special justification." This court, myself included, can and does overrule precedent when appropriate. Ultimately, however, it is simply not evident that Shiffra is so unsound in principle as to require this court to overturn it and its progeny. The lead opinion wanders far beyond the confines of the briefing and

---

[15] Hence, although I write in dissent, I dissent from the lead opinion; I agree with the functional outcome of this case.

33

argument in this case, discarding the Shiffra-Green framework despite incomplete knowledge of the many applicable constitutional considerations. The potential for error here (the same type of error which the State and lead opinion allege occurred in Shiffra) is substantial. The fractured nature of today's opinion, and of the opinion in Johnson, 348 Wis. 2d 450 (per curiam), demonstrate, at the very least, the doubtfulness of whether Shiffra is in fact so incoherent as to justify its rejection. When there is this much turmoil regarding the vitality or not of a line of cases, it may well be advisable to err on the side of caution. Johnson Controls, 264 Wis. 2d 60, ¶94 ("A court's decision to depart from precedent is not to be made casually. It must be explained carefully and fully to insure that the court is not acting in an arbitrary or capricious manner. A court should not depart from precedent without sufficient justification."). "Circuit courts and counsel have functioned well using the Shiffra/Green analysis for many years . . . ." Johnson, 353 Wis. 2d 119, ¶12 (per curiam).

¶231 This court is more than simply the sum of its current members. It is an institution that endures long after any one individual justice leaves the bench. The public needs certainty——a stable rule of law——not what amounts to a collection of several law review articles by the members of this court. The lead opinion may, in time, be proven correct by the Supreme Court of the United States. Or, this court may be compelled to revisit the Shiffra doctrine on the basis of future

34

developments in related case law. But the State and the lead opinion have not today provided the "special justification" required to decide that we were wrong, in Green, to hew to the Shiffra line of cases. Green, 253 Wis. 2d 356, ¶21 n.4.

¶232 I conclude that this court should not abandon the Shiffra-Green framework and would therefore affirm the decision of the court of appeals.[16]

¶233 For the foregoing reasons, I respectfully dissent.

---

[16] The parties do not dispute whether the circuit court and the court of appeals were correct in concluding that Lynch met the Green showing for in camera review of the files at issue. Without briefing, I do not address the question. However, I emphasize again that the Green showing is not meant to be perfunctory. See Green, 253 Wis. 2d 356, ¶¶33-35.